Patrick F. **BOYLE,** et al.,
Plaintiffs, Appellees,

v.

William **BURKE,** Joseph Yergeau, Mark G. **Kelliher,** Peter Weeks, Ruth Griffin and Raymond Labrie, Defendants, Appellants.

No. 90–1530.

United States Court of Appeals,
First Circuit.

Heard Oct. 4, 1990.

Decided Feb. 6, 1991.

---

See also 717 F.Supp. 23.

Wayne C. Beyer, with whom Cleveland, Waters & Bass, P.A., was on brief, for defendants, appellants.

Ina P. Schiff, with whom Henry F. Spaloss, was on brief, for plaintiffs, appellees.

Before CAMPBELL and TORRUELLA, Circuit Judges, and ATKINS,* Senior District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

The plaintiffs, police officers for the Town of Portsmouth, filed a civil rights action, 42 U.S.C. § 1983, against the Board of Police Commissioners of Portsmouth, the City, and several individuals including William Burke, Joseph Yergeau, Mark Kelliher, Peter Weeks, Ruth Griffin, and Raymond Labrie, appellants here. Plaintiffs seek injunctive and declaratory relief as well as monetary damages for injuries to their military employment sustained as a result of the defendants' allegedly illegal policy preventing Portsmouth Police Officers from serving as active members of the military reserve or national guard. Plaintiffs allege that the policy violates their rights under the Veteran's Reemployment Rights Act ("V.R.R.A."), 38 U.S.C. §§ 2021–2026, the First and Fourteenth Amendments to the United States Constitution, and New Hampshire Law, N.H. RSA 110–B:65.

The defendants moved for summary judgment on plaintiffs' claims on several grounds. The district court denied the motion on all counts except for those based on New Hampshire law. Defendants appealed from the denial, raising the issue of their individual qualified immunity. In such an interlocutory appeal, our jurisdiction is limited to considering whether the district court erred in denying summary judgment to defendants against plaintiffs' damages claims based on defendants' individual qualified immunity. *See Harlow v. Fitz-*

*gerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Defendants argue that, at the time of the alleged violations of plaintiffs' rights, the department policy challenged by the plaintiffs did not violate clearly established federal statutory or constitutional rights; therefore, they are immune, in their personal capacities, from damages liability. *See Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

### I.

Indulging all inferences in favor of the plaintiffs, the nonmovants, *see Petitti v. New England T. & T. Co.,* 909 F.2d 28, 31 (1st Cir.1990), we summarize the facts relevant to this appeal. Plaintiffs Boyle, Prendergast, and Centola were police officers for the Town of Portsmouth. Formerly a member of the Army Reserves, Boyle took inactive status when he joined the department in June 1985. In January, 1988, Boyle notified the department that, as of December 1, 1987, he had resumed active status in the reserves. Prendergast joined the force in March, 1977 and resigned in April, 1988. He had been a member of the New Hampshire National Guard prior to his application to the police department. In August, 1986, he wrote Chief Labrie, requesting an explanation of department policy with respect to reserve participation and was informed in September, 1986 that the department prohibited such participation. Centola joined the Portsmouth Police Department in November, 1979 and enlisted in a Coast Guard Reserve unit in October, 1988.

Defendant-appellant Raymond Labrie served as a member of the Portsmouth Police Department from September, 1969 to May, 1987, eventually becoming chief. He was succeeded as chief by defendant-appellant William Burke. Defendant-appellant Ruth Griffin served on the Board of Police Commissioners from April, 1982 to May, 1988. She was succeeded by defendant-appellant Peter Weeks in 1988. Defendants-appellants Joseph Yergeau and Mark Kelliher are currently serving as

---

* Of the Southern District of Florida, sitting by designation.

members of the Board, both appointed in 1987.

Until 1988, the Portsmouth Police Department's official policy restricted full-time officers' outside employment. This policy was interpreted by the department to preclude officers' active participation in the reserves. The reason cited by the city for the policy was concern over the city's ability to provide police protection to the public in the event officers' reserve obligation created inadequate staffing. No officers were active members of the reserves until plaintiff Boyle announced that he had resumed active status effective December, 1987.

In March, 1988, Chief Burke circulated a statement implementing a change in the Standard Operating Procedure to permit reserve participation. S.O.P. 66 stated in part:

> Upon receipt of written notice of training schedules, the supervisor shall make appropriate arrangements to cover the employee's shifts. In the event of a scheduling conflict, the supervisor shall contact the employee's military commanding officer or supervisor to resolve the scheduling conflict.

The S.O.P. was issued by Chief Burke on July 19, 1988.

Plaintiffs claim that the police department's policy, both the original and the amended versions, violated their rights under the Veteran's Reemployment Rights Act, 38 U.S.C. §§ 2021—2026. They allege that the original policy illegally conditioned employment as a police officer on their agreement not to participate in the reserves, thereby depriving them of the opportunity for military employment guaranteed under the Act. They contend that, by permitting negotiation over scheduling, the amended policy interfered with their right to participate in training guaranteed by § 2024 of the Act. They also allege that the amended policy was used to frustrate and discourage their participation and that other retaliatory actions were taken against them for expressing their intention to participate in the reserves and for asserting their rights under the Act. These retaliatory actions, they insist, violated their First Amendment right to petition the government for redress of grievances. Finally, they argue that the department's policy and defendants' enforcement of the policy violated their rights to due process and equal protection guaranteed by the Fourteenth Amendment to the United States Constitution.

On appeal, we must decide whether, assuming the plaintiffs' version of the facts, a "reasonable official" would have understood that the department's policy preventing participation in the reserves violated the plaintiffs' rights. *See Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039.

## II.

### A. *Veteran's Reemployment Rights Act, 38 U.S.C. §§ 2021-26.*

#### 1. The Original Policy

■ Based on the language of the Veteran's Reemployment Rights Act, the case law interpreting the Act, and the legislative history of the 1986 amendment to the Act, we believe that, before October 1986, the degree to which the Act permitted an employer to condition hiring on nonparticipation in the reserves was not clearly established. Therefore, defendants enjoy qualified immunity from suit in their personal capacities based on their actions pursuant to the departmental policy prior to the 1986 amendment to the Act.

Before the 1986 amendment, the Act focused on the consequences suffered by reservists in their civilian employment as a result of their military obligations. The statute on its face protected reservists only from the denial of "retention in employment or any promotion or other incident or advantage of employment, because of any obligation as a member of a Reserve component of the Armed Forces." 38 U.S.C. § 2021(b)(3). Although "advantage of employment" arguably could be construed to include hiring, the language cannot fairly be read to have clearly established rights in the hiring context. Indeed, the legislative history suggests a narrower intention to protect current reservists from adverse employment actions rather than to secure an affirmative right of an employee to join the

reserves. *See, e.g.,* S.Rep. No. 1477, 90th Cong., 2d Sess. 1–2 (1968), U.S.Code Cong. & Admin.News 1968, 3421 (stating the purpose of the enactment as "prevent[ing] reservists and National Guardsmen not on active duty who must attend weekend drills or summer training from being discriminated against in employment because of their Reserve membership").

Case law prior to 1986 did not serve to clarify the scope of the statute with respect to employers' practice of conditioning employment on nonparticipation in the reserves. In *Monroe v. Standard Oil Co.,* 452 U.S. 549, 101 S.Ct. 2510, 69 L.Ed.2d 226 (1980), the Supreme Court held only that the statute "was enacted for the significant but *limited* purpose of protecting the employee-reservist against discriminations like discharge and demotion, motivated solely by reserve status." *Id.* at 559, 101 S.Ct. at 2516 (emphasis supplied). The *Monroe* decision addressed only the scope of an employer's obligation to accommodate the current reservist, not the obligation to hire reservists or to permit nonreservist employees from joining the reserves. Indeed, at least one case, *Hughes v. Frank,* 414 F.Supp. 468 (E.D.N.Y.1976), *aff'd,* 551 F.2d 300 (2d Cir.1976), *cert. denied,* 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 360 (1977), upheld a county police department policy limiting reserve participation.

The 1986 amendment to the Act expressly extended the Act's coverage to hiring for the first time. Effective October 28, 1986, 38 U.S.C. § 2021(b)(3) was amended to include the following italicized language:

> (3) Any person who *seeks or* holds a position [with a municipal employer] shall not be denied *hiring,* retention in employment, or any promotion or other incident or advantage of employment because of any obligation as a member of a Reserve component of the Armed Forces.

Pub.L. No. 99–576, Title III, § 331, Oct. 28, 1986 (emphasis supplied). The legislative history of the amendment indicates that Congress believed it necessary to expand coverage of the Act to include discrimination in hiring in order to fill a perceived gap in the statute. *See* H.R.Rep. No. 99–626,

99th Cong., 2d Sess. 2 (1986) (stating that "[c]urrent law ... provides no protection for members of the Guard and Reserve against discrimination in initial employment because a job seeker is a member of a reserve component"). In a statement to the House Veterans' Affairs Committee, Donald E. Shasteen, Assistant Secretary for Veteran's Employment and Training, Department of Labor, offered the following explanation of the amendment's purpose:

> [T]he bill would amend section 2021(b)(3) chapter 43 of title 38, United States Code, to make it unlawful for an employer to refuse to hire a person because such person is a member of a Reserve component or the National Guard.... The bill would protect reservists and members of the National Guard in the initial hiring situation where they may not be hired because of their obligation to participate in military drills or active duty for training.

H.R.Rep. No. 99–626, 99th Cong., 2d Sess. 5 (1986).

The legislative history also indicates that Congress intended the amendment to extend the coverage of the Act to current employees seeking to join the reserves—a category apparently unprotected prior to 1986. Representative G.V. Montgomery, Chairman of the House Veterans' Affairs Committee, acknowledged that "reservists and national guardsmen are facing increased pressure from civilian employers which includes *refusal to hire, refusal to allow already hired employees to join the Reserves or National Guard ....*" 132 Cong.Rec. H9297 (daily ed. Oct. 7, 1986) (statement of Rep. G.V. Montgomery). He then stated that "[t]hese refusals are all contrary to the spirit and intent of 2021(b)(3) as it is now being amended." *Id.*

Thus, based on the language of the statute, the case law, and the legislative history of the amendment, we conclude that the extent to which the Act prohibited employers from restricting employee membership in the reserves, for present purposes, was not clearly established prior to 1986. Because the only issue properly before us in this interlocutory appeal is the district

court's denial of summary judgment based on qualified immunity, we need not determine the precise contours of the Act's coverage prior to 1986. It is enough that the rights of these reservists were not *clearly established* until the October, 1986 amendment. It follows that the individual appellants are immune from suit in their personal capacities for actions which were taken prior to the 1986 amendment and which allegedly deterred appellees from joining the reserves or national guard. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

■ The situation is different, however, after the 1986 amendment to the Act. As we have noted, the 1986 amendment made clear that an employer could not refuse to hire an individual because of his or her participation in the reserves or national guard. By prohibiting an employer from conditioning employment on nonparticipation in the reserves, Congress intended to protect potential and existing reservists from policies that deter employees from joining the reserves. Thus, to the extent that the policy prohibiting reserve participation continued after 1986, defendants are not protected by qualified immunity— plaintiffs' rights material to the claim under 38 U.S.C. § 2021(b)(3) were clearly established after the amendment to the Act.

### 2. The Amended Policy and "Reasonable Accommodation"

■ Plaintiffs' claims are not limited to injuries stemming from the department's original policy. Rather, plaintiffs argue that, even the amended policy, which permitted reserve participation but instructed department supervisors to negotiate scheduling conflicts with the reservist-employee's commanding officer, violated plaintiffs' rights under the V.R.R.A. as amended.[1] However, because the current law with respect to the "reasonable accommodation" of reservists' requests for leave is not clearly established, we hold that the defendants are immune from damages

based on their actions pursuant to the amended policy. We do not decide at this interlocutory stage, however, whether the department's revised policy actually violated plaintiffs' rights under the Act.

In this regard, we note that this court has never had occasion to consider whether the V.R.R.A. requires "reasonable accommodation" of the needs of both the reservist and the employer when a reservist requests a leave of absence. Other circuits have articulated varying standards. For example, in *Lee v. City of Pensacola,* 634 F.2d 886 (5th Cir.1981), the Fifth Circuit held that "the difficulties faced by the City in carrying out its important police duties" justified the city's refusal to extend an employee-reservist's leave of absence. *Id.* at 889. Similarly, in *Eidukonis v. Southeastern Pa. Transp. Auth.,* 873 F.2d 688 (3d Cir.1989), the Third Circuit held that "a standard which evaluates an employee's request for leave and the civilian employer's response on the basis of reasonableness under all of the circumstances is the appropriate one under 38 U.S.C. § 2024." *Id.* at 694.

On the other hand, in *Gulf States Paper Corp. v. Ingram,* 811 F.2d 1464 (11th Cir. 1987), the Eleventh Circuit struck the balance more heavily in favor of the reservist, holding that "[t]he reservist begins with a presumption that her leave request is reasonable," and suggests that, absent "questionable conduct of the employee," the reasonableness test would likely be satisfied. *Id.* at 1470. Most recently, in *Kolkhorst v. Tilghman,* 897 F.2d 1282 (1990), the Fourth Circuit rejected the reasonableness standard as inconsistent with the purposes of the Act. *Id.* at 1286.

The Portsmouth Police Department's revised policy provides a mechanism for balancing the needs of the department with the reservist's need to fulfill his military obligations. Given the lack of case law in this Circuit and the varying standards applied in the cases from other circuits, we

---

**1.** 38 U.S.C. § 2024(d) provides that a reservist "shall upon request be granted a leave of absence by such person's employer for the period

required to perform active duty for training or inactive duty training in the Armed Forces of the United States."

cannot say that the plaintiffs' rights were so clear that a reasonable official would have understood that the policy providing for some negotiation regarding scheduling needs violated those rights. *See Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. Thus, the individual defendants enjoy qualified immunity with respect to plaintiffs' damages claims against them based on the revised policy.[2] At this stage, we, of course, do not decide whether such a policy is actually consistent with the requirements of the Act or whether a reasonableness standard is appropriate in evaluating the policy.

### B. *Due Process and Equal Protection.*

■ We next examine plaintiffs' claims under 42 U.S.C. § 1983, alleging violations of their constitutional rights to equal protection and procedural due process. We agree with defendants that they are entitled to qualified immunity from damages arising from these alleged constitutional violations. Not only have defendants violated no clearly established rights to due process and equal protection, we do not believe they have violated any such rights at all. It follows that defendants are entitled to qualified immunity because their "actions could reasonably have been thought consistent with the rights [they are] alleged to have violated." *Anderson*, 483 U.S. at 638, 107 S.Ct. at 3038; *see Feliciano–Angulo v. Rivera–Cruz*, 858 F.2d 40, 44 (1st Cir.1988) (holding that "where it has been shown not only that defendant did not violate law *clearly established* at the time of the event, but did not violate the law *at all*," defendants were entitled to summary judgment based on qualified immunity) (emphasis in original); *Emery v. Holmes*, 824 F.2d 143, 147 (1st Cir.1987) (considering, as first part of qualified immunity analysis, whether plaintiff's rights were violated); *cf. Unwin v. Campbell*, 863 F.2d 124 (1st Cir.1988) (granting

summary judgment based on qualified immunity where undisputed facts revealed that defendants had not caused alleged injury).

Plaintiffs contend that the police department's former policy of prohibiting reserve participation, and its current policy of not reimbursing reservists for the difference between their wages as police officers and their military pay while they are on active duty, violate the Equal Protection Clause of the United States Constitution. Their argument seems to be based on the fact that, unlike police officers, employees in other city departments were and are permitted to join the reserves, and they receive reimbursement for their loss in income.

Under familiar principles of equal protection analysis, the classification at issue here, the plaintiffs' status as police officers, need only survive rational basis review. *See, e.g., Hodel v. Indiana*, 452 U.S. 314, 331, 101 S.Ct. 2376, 2386–87, 69 L.Ed.2d 40 (1981) ("Social and economic legislation that does not employ suspect classifications or impinge on fundamental rights must be upheld ... when the legislative means are rationally related to a legitimate government purpose."). Applying this standard, the Supreme Court has warned that, in general, legislative classifications are "presumed to be valid." *Lyng v. International Union, Etc.*, 485 U.S. 360, 370, 108 S.Ct. 1184, 1191–92, 99 L.Ed.2d 380 (1988). If such a classification "has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (quoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)).

---

**2.** To the extent that defendants, under the guise of negotiating scheduling under the new policy, attempted to frustrate plaintiffs' participation in military training, they would not be protected by qualified immunity. Such activity goes beyond the goal of "reasonable accommodation" and violates § 2024 of the Act.

The police department offers two separate explanations for its policies. First, it justifies its prohibition on reserve participation based on the possibility that officers' reserve participation would prevent the department from providing adequate police protection in the event that officers were called to active duty. The district court rejected this rationale, noting that most other police departments permit reserve participation. Although this may be true as an empirical matter, it does not lead to the conclusion that the Portsmouth policy was without rational basis. Indeed, in the event of a mass mobilization of reservists, the possibility exists for a town to be left with inadequate police protection. We cannot say that a policy designed to deal with such a possibility lacks a rational basis.

The department also points to the fact that the police officers form a separate bargaining unit for the purposes of negotiating city contracts. According to the affidavit of the city's union contract negotiator, Thomas Cayten, employment benefits vary greatly among the various city departments. Reimbursement of reservists for wages lost during active duty is among the benefits negotiated independently by the city departments. The city's system of negotiating the employment terms of different groups of city employees is reasonably designed to meet the needs both of the city and the employees. The Equal Protection Clause does not require that the system provide precisely the same employment benefits for all of its employees.

Under rational basis review, courts have upheld classifications based "upon a state of facts that reasonably can be conceived to constitute a distinction, or difference in state policy." *Allied Stores v. Bowers,* 358 U.S. 522, 530, 79 S.Ct. 437, 443, 3 L.Ed.2d 480 (1959). The existence of separate bargaining units among the city departments provides a rational explanation of the differences in benefits among the city departments. Moreover, while the policy prohibiting reserve participation was made illegal by the 1986 amendment to the V.R.R.A., the security rationale for that policy meets the rational basis standard under the Equal Protections Clause. *Cf. Baker v. City of Concord,* 916 F.2d 744 (1st Cir.1990) (New Hampshire law making recipients of state aid ineligible for town welfare did not violate Equal Protection Clause); *Montalvo–Huertas v. Rivera–Cruz,* 885 F.2d 971 (1st Cir.1989) (under rational basis review, Puerto Rico's Closing Law did not violate Equal Protection Clause despite numerous statutory exemptions).

Similarly deficient is plaintiffs' theory that the police department's policy violated their rights to procedural due process. First, plaintiffs' rights under the V.R.R.A. were defined and guaranteed by federal law and those rights were not subject to limitations imposed by state policy. In other words, after 1986, the police department could not legally refuse to hire reservists nor prevent police officers from joining the reserves, regardless of the amount of process provided. Thus, plaintiffs' real complaint is that they were prevented from joining the reserves in violation of the statute, not that they were provided inadequate process.

Nevertheless, even assuming that the plaintiffs' rights under the statute are of the type protected by the Due Process Clause and that the police department's policy undermined those rights, plaintiffs' procedural due process theory lacks merit. Plaintiffs have not argued that the department refused to permit them to participate in the reserves because it determined that they, as individuals, did not meet specific requirements. Rather, they argue that the department's action was a result of a department-wide policy restricting outside employment. We have said elsewhere that "[w]hen statutory benefits are denied or terminated pursuant to a class-wide policy determination, as opposed to an individual determination of eligibility, the Due Process Clause does not require the state to afford a hearing to each affected individual." *Hoffman v. City of Warwick,* 909

F.2d 608, 620 (1st Cir.1990); *see Carson v. Block,* 790 F.2d 562, 566 (7th Cir.), *cert. denied,* 479 U.S. 1017, 107 S.Ct. 669, 93 L.Ed.2d 721 (1986); *Kizas v. Webster,* 707 F.2d 524, 540 n. 88 (D.C.Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984).

Thus, because plaintiffs' due process and equal protection claims are deficient as a matter of law, defendants were plainly entitled to summary judgment granting them qualified immunity from damages arising from these claims.

## C. *First Amendment Right to Petition.*

■ Finally, we consider whether the defendants' actions allegedly taken in retaliation for plaintiffs' legal challenge to the department policy violated plaintiffs' clearly established right to petition the government guaranteed by the First Amendment. The First Amendment guarantees every citizen's right "to petition the Government for a redress of grievances." U.S. Const. amend. I. An individual does not lose this right because she is employed by the government. *Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983). Nevertheless, absolute First Amendment protection is not accorded to any grievance a public employee files against an employer, without regard to content. In *Connick,* the Supreme Court struck a balance between the speech rights of the employee as a citizen and the interests of the State as employer and provider of essential services, holding that

> [w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.

*Id.* at 146, 103 S.Ct. at 1690; *see Gray v. Lacke,* 885 F.2d 399, 412–13 (7th Cir.1989); *Belk v. Town of Minocqua,* 858 F.2d 1258 (7th Cir.1988).

Thus, the public employee's right to petition the government with respect to matters of public concern has been clearly established since *Connick,* at least. Nevertheless, *Anderson v. Creighton* requires us to determine not only whether the right was clearly established but also whether a reasonable official "would understand that *what he is doing* violated that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039 (emphasis supplied). Here the record on appeal does not reveal with any specificity the nature of the alleged retaliatory conduct. We therefore have no way to determine whether a reasonable official would have known that he was violating plaintiffs' First Amendment rights. The thinness of the record combined with the district court's failure to address the First Amendment claim precludes effective review at this point. Nevertheless, as this case continues and the record is more fully developed, the district court may give further consideration to the qualified immunity defense with respect to plaintiffs' First Amendment claims.

## III.

In summary, we hold that the relevant law with respect to the V.R.R.A. claims was not clear until the statute was amended in 1986. Defendants are, therefore, entitled to qualified immunity from damages based on statutory claims arising before 1986. They are also immune from suit based on claims arising after the department's policy was amended in March, 1988 to permit reserve participation, except to the extent that defendants used the scheduling accommodation provision to frustrate plaintiffs' participation in military training. With respect to their constitutional claims, plaintiffs-appellees have not made out valid claims either under the Due Process Clause or the Equal Protection Clause. Clearly, therefore, defendants are entitled to qualified immunity against all such claims whatever the time period involved. With respect to the alleged actions taken by defendants in retaliation for plaintiffs' filing this

law suit, the law clearly established a public employee's right to petition the government regarding matters of public concern without fear of retaliation. Nevertheless, the record on appeal does not reveal the nature of defendants' retaliatory conduct with sufficient specificity to permit analysis under *Anderson v. Creighton, supra.* Consequently, this aspect of qualified immunity cannot be presently resolved, and remains open for later determination by the district court.

We reverse the district court's denial of summary judgment with respect to the V.R.R.A. claims arising before the 1986 amendment and with respect to plaintiffs' constitutional claims based on alleged violations of the Due Process and Equal Protection clauses. As to these claims, we remand with instructions to enter summary judgment for defendants based on their qualified immunity. With respect to claims arising after the department's March, 1988 change in policy, we vacate the denial of summary judgment and remand with instructions to enter summary judgment for defendants, except to the extent that the district court finds that a genuine issue of material fact exists concerning the alleged bad faith implementation of the amended policy. We affirm the district court's denial of summary judgment with respect to alleged violations of the plaintiffs' rights under the V.R.R.A. after 1986 and before the official change in policy in 1988.

*Reversed in part, affirmed in part, and remanded. The parties shall bear their own costs.*