UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

 

No. 95-2005

STANLEY DIAZ-GANDIA,

Plaintiff, Appellant,

v.

MARIA ROSA DAPENA-THOMPSON, ET AL.,

Defendants, Appellees.

 

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colon, U.S. Magistrate Judge] 

 

Before

Torruella, Chief Judge, 

Coffin, Senior Circuit Judge, 

and Cyr, Circuit Judge. 

 

Rafael A. Oliveras Lopez de Victoria for appellant. 
Lorraine J. Riefkohl, Assistant Solicitor General, with whom 
Carlos Lugo-Fiol, Solicitor General, and Jacqueline Novas-Debien, 
Deputy Solicitor General, were on brief for appellees.

 

July 25, 1996
 

CYR, Circuit Judge. This appeal challenges a summary CYR, Circuit Judge. 

judgment dismissing various claims brought under the Veteran's

Reemployment Rights Act of 1968 ("VRRA") against the Right to

Work Administration of the Commonwealth of Puerto Rico ("RWA")

for allegedly denying plaintiff-appellant Stanley Xavier Diaz

Gandia ("Diaz") certain incidents and advantages of employment

solely by reason of his participation in the United States Army

Reserves. We vacate the district court judgment and remand for

further proceedings. 

I I

BACKGROUND1 BACKGROUND 

Appellant Diaz, who possesses a Bachelor's Degree in

Psychology and a Masters Degree in Vocational Counseling, was

hired by defendant-appellee RWA in August 1980, as an Occupa-

tional Counselor I in its Bayamon Regional Office. During the

next few years he was promoted and transferred several times

before attaining the classification of Personnel Relations

Counselor, equivalent to Occupational Counselor III, at the

Central Office in San Juan.

In September 1986 Diaz enlisted in the United States

Army and entered on active duty for approximately nine months,

receiving military leave pay from the RWA as required by Puerto

Rico law. P.R. Laws Ann. tit. 25 2082. Following his honor-
 

1We view all competent evidence and attendant reasonable
inferences in the light most favorable to Diaz, the party resist-
ing summary judgment. McCabe v. Life-Line Ambulance Serv., Inc., 
77 F.3d 540, 544 (1st Cir.), petition for cert. filed, 64 U.S.- 
L.W. 3808 (U.S. May 29, 1996) (No. 95-1929). 

2

able discharge in May 1987, he became an active reservist with

the 448th Engineer Battalion at Fort Buchanan, which meant that

he remained on paid military leave from the RWA until July 1987.

When Diaz reported for duty with the RWA at its Central

Office following his return from active duty with the Army

Reserves, he discovered that a person with inferior educational

qualifications and experience had been assigned to fill his

position. Nevertheless, as directed, Diaz reported for work as

an Occupational Counselor III in the San Juan Regional Office,

located in the same building, where for one month he was assigned

to a cubicle filled with boxes and office supplies but no desk or

chair. He complained to the Office of Reservist and Veteran's

Affairs, and, in March 1988, to the Board of Appeals of the

Commonwealth Personnel Administration System, all to no avail.

Approximately two months later, a complaint to the Employee's

Association resulted in his reassignment to the Central Office as

a Counselor in the Business Development Area. 

In addition, Diaz was reprimanded unjustly by his

supervisors on two occasions upon his return from military leave.

First, he states that the Director of the San Juan Regional

Office, Aida Iris Castro Mundo, informed him that he wasted a lot

of time on military exercises. Following their meeting, Diaz

received a letter from Castro Mundo, dated April 15, 1988,

advising that he needed to improve his job performance in light

of the fact that he had: delayed assigning cases to other

3

counselors; refused to receive cases after 3:30 p.m.; frequently

absented himself from his workplace during office hours; failed

to complete cases on time; and either failed to perform, or

performed poorly, various other official responsibilities. Diaz

denies these accusations. Second, at his deposition Diaz testi-

fied that he had been reprimanded unfairly by another supervisor,

Jose Figueroa, for not being at his work station during the

middle of a day following his return from military training. He

explained his four-hour absence on that occasion as having been

devoted to making sure the RWA paid him for the time he was on

military leave. Diaz further states that he received no job

description until July 1994, despite a promise six years earlier

that he would receive one, and that his supervisors harassed him

by evaluating his work performance absent a job description. 

No other negative job evaluation appears in Diaz'

personnel record. Nonetheless, and though in June 1988 he had

been designated a Counselor of Special Projects in the Central

Office as he requested, Diaz testified that Supervisor Fernando

Freses made him uncomfortable with jokes about the military and

its exercises, and that he so informed Freses. When asked on

deposition whether it was a joke, Diaz replied: "It was like a

joke, but I did not know what that would lead to. Because maybe

behind the words, well, there could be other intentions . . . ." 

Diaz testified that his desk and belongings were

relocated four times before or during military leaves in 1991

alone, though there was no change in work duties. For example,

4

in July 1991, without warning and after submitting a request for

military leave, his desk was set apart from co-workers until he

complained to his supervisor. When he returned from military

leave the following month, however, his desk had been removed to

the Training Division on the same floor. Diaz was told by the

supervisor that this was a temporary measure, necessitated by a

remodeling project. But when he returned from leave again in

September 1991, after the remodeling had been completed, his desk

had been relocated again, this time to the Payment Division.

Once again he was told by his supervisor that the move was

temporary. Upon his return from military leave in November 1991,

his desk was located in the Learning Program Division, ostensibly

as an emergency measure related to space problems. 

The remodeling plans for the Communal Development

Division included no work station for Diaz, even though work

stations were provided for two co-workers who had arrived after

Diaz.2 As a consequence, Diaz remained in the Learning Program

Division until the end of May 1992. Finally, unlike all his co-

workers in the Learning Program Division and in the Communal

Development Division, Diaz was not provided a telephone. Super-

visor Jose Figueroa explained to Diaz in March 1992: "Oh, you do

not have a telephone because the day the telephone company

operator came you were in [sic] one of these [sic] damn military

leaves of yours." In late March 1992, Diaz complained to his

 

2In October 1989, the Special Projects Area became the
Communal Development Division. 

5

supervisor that all his work duties had been reassigned to

others. 

Around the same time, he complained of migraine head-

aches and the State Insurance Fund ordered home rest from April

10 to May 18, 1992. Upon returning from medical leave, Diaz was

given no work assignment for approximately two weeks. The

following month he was transferred to the Participant Services

Division in the Central Office, located on the tenth floor of the

same building. After protesting the transfer and requesting

administrative review, he reported as directed to the Participant

Services Division upon returning from another military leave and

was informed that there was no work for him to do. Approximately

one week later, having been given no work assignment, he com-

plained to the State Insurance Fund that he was experiencing

insomnia, headaches and neck and back pain. A private psychia-

trist prescribed two weeks' rest. Subsequently, another psychia-

trist evaluated Diaz, concluding that he suffered from dysthymia

with anxiety somatization.3 

On August 6, 1992, having been assigned no work for

five consecutive weeks, during a ten-week period, Diaz received a

copy of a letter, dated July 24, 1992, from the manager of

Participant Services to the director of Occupational Orientation,

 

3Dysthymia: "any despondent mood or depressive tendency,
often associated with hypochondriasis." Blakiston's Gould 
Medical Dictionary 420 (4th ed. 1956). Somatization: "the 
neurotic displacement of emotional conflicts onto the body,
resulting in various physical symptoms or complaints . . . ."
Id. at 1266. 

6

advising that Diaz should be given work as an Occupational

Counselor, at an unspecified grade level. Only then was he given

work duties. In September 1992, he was instructed to "read" a

200-page statute in three days, but found the task too demanding

as he had been prescribed Prozac, then "something else with a

lithium base," and finally Xanac, by his psychiatrist. At Diaz'

request, the director of Occupational Orientation later reduced

the assignment to twenty-five pages per day. Diaz testified that

other incidents also made him "feel very bad because . . . all

this mess, of the Army Reserve and the drills, this was all going

to continue. And this was going to be a nightmare until I left

the Army or until I left this agency, this was going to contin-

ue." 

On July 16, 1993, Diaz filed suit against defendants-

appellees Maria Rosa Dapena-Thompson and her successor, in their

respective official capacities as the RWA director, alleging that

he had been harassed, denigrated, and persecuted after returning

from military leave for required training and drills with his

reserve unit. He demanded damages for mental and emotional

suffering, as well as reclassification in accordance with RWA

rules and regulations. Shortly after filing the complaint, Diaz

was promoted to Occupational Counselor IV, the highest grade he

has ever attained. 

In due course, defendants moved for summary judgment on

the ground, inter alia, that there was no trialworthy dispute 

concerning whether defendants had discriminated against Diaz in

7

violation of the VRRA. Diaz seasonably interposed opposition to

the motion for summary judgment. Thereafter, the parties stipu-

lated to certain uncontested facts and consented to proceed to

final judgment before a magistrate judge in accordance with 28

U.S.C. 636(c)(1) and (3) and Fed. R. Civ. P. 73. Ultimately, the

magistrate judge entered summary judgment for both defendants. 

II II

DISCUSSION4 DISCUSSION 

The VRRA is to be liberally construed. Alabama Power 

Co. v. Davis, 431 U.S. 581, 584 (1977); Bunnell v. New England 

Teamsters & Trucking Indus. Pension Fund, 655 F.2d 451, 453 (1st 

Cir. 1981), cert. denied, 455 U.S. 908 (1982). VRRA 2021(b)(3) 

provides in pertinent part that "[a]ny person [employed by a

State or political subdivision, or by a private employer,] shall

not be denied . . . retention in employment, or any promotion or

other incident or advantage of employment because of any obliga- 

tion as a member of a Reserve component of the Armed Forces." 38

U.S.C. 2021(b)(3) (emphasis added).5 Its legislative history
 

4We review the summary judgment ruling de novo. McCabe, 77 
F.3d at 544. 

5Although Diaz cites to VRRA 2021(b)(1), which relates to
veteran's reemployment rights, the magistrate judge appropriately 
analyzed the claim under 2021(b)(3), which pertains to the
rights of reservists. In turn, 2022 establishes a remedy
against covered employers who fail to comply with 2021(b)(3): 

If any employer, who is a private employer or 
a State or political subdivision thereof, 
fails or refuses to comply with the provi- 
sions of section . . . [2021](b)(3) . . . of 
this title, the district court . . . shall 
have the power . . . to require such employer 

8

likewise reflects that VRRA 2021(b)(3) "was enacted for the . .

. limited purpose of protecting the employee-reservist against

discriminations like discharge and demotion, motivated solely by 

reserve status . . . [and] the temptation of employers to deny

them the same treatment afforded their co-workers without mili-

tary obligations." Monroe v. Standard Oil Co., 452 U.S. 549, 

559-600 (1981) (emphasis added). 

A. "Discriminations Like Discharge and Demotion" A. "Discriminations Like Discharge and Demotion 

VRRA 2021(b)(3) is designed to deter discriminatory

employment actions "like discharge and demotion," id. at 559; see 

also Carlson v. New Hampshire Dep't of Safety, 609 F.2d 1024, 

1027 (1st Cir. 1979), cert. denied, 446 U.S. 913 (1980), based 

solely on the plaintiff-employee's reservist responsibilities.

Monroe, 452 U.S. at 559.6 Since Diaz was neither discharged, 

 

to comply with such provisions and to compen- 
sate such person for any loss of wages or 
benefits suffered by reason of such employ- 
er's unlawful action. Any such compensation
shall be in addition to and shall not be
deemed to diminish any of the benefits pro-
vided for in such provisions. . . . No State
statute of limitations shall apply to any
proceedings under this chapter.

38 U.S.C. 2022 (emphasis added). 

6On October 13, 1994, the Uniformed Services Employment and
Reemployment Rights Act ("USERRA"), 38 U.S.C. 4301 et seq., 
replaced the VRRA. Gummo v. Village of Depew, N.Y., 75 F.3d 98, 
105 (2d Cir.), cert. denied, 64 U.S.L.W. 3759, 3762 (U.S. May 13, 
1996) (No. 95-1465). Although Diaz contends on appeal that
USERRA 4311 retroactively applies to his discrimination claim,
he failed to raise this contention in the district court through-
out the entire 8-month period following USERRA's enactment.
Consequently, we deem it waived. See Credit Francais Int'l, S.A. 
v. Bio-Vita, Ltd., 78 F.3d 698, 709 (1st Cir. 1996). 

9

see Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 704 (1st 

Cir. 1993), nor formally demoted, we first determine whether he

was subjected to a discriminatory employment action "like demo-

tion." See Monroe, 452 U.S. at 559-600. Secondly, we inquire 

whether any such discriminatory employment action was "motivated

solely by [his] reserve status." Id. at 559.  

VRRA 2021(b)(3) was enacted "to protect potential and

existing reservists from policies that deter employees from

joining the reserves." Boyle v. Burke, 925 F.2d 497, 502 (1st 

Cir. 1991); see also Gummo v. Village of Depew, N.Y., 75 F.3d 98, 

104 (2d Cir.), cert. denied, 64 U.S.L.W. 3759, 3762 (U.S. May 13, 

1996) (No. 95-1465). Although appellees contend that their

employment actions denied Diaz no "incident or advantage of

employment" within the meaning of VRRA 2021(b)(3), we think

there can be no question that discriminatory employment actions

"like demotion," including constructive demotion, based solely on

reservist participation, constitute the very sort of discrimina-

tory conduct the Congress sought to deter under 2021(b)(3). 

We have held that a state trooper was denied an "inci-

dent or advantage of employment" by reason of his reservist

training and responsibilities when he was transferred from an

eight-hour weekday shift to a nine-hour shift which included

weekend duty. Carlson, 609 F.2d at 1027. There we noted that 

"the [defendant-employer] would be free to transfer plaintiff at

any time, including while his reserve duties were in progress,

for reasons unrelated to his reserve obligations[,] but . . . not

10

. . . to [deny] him . . . a previously enjoyed incident or

advantage of employment" based on his reserve obligations. Id. 

More to the present point, Carlson made clear that the shift 

reassignment was a constructive demotion because it required

weekend work, as well as night work, and therefore constituted an

employment action which might deter a trooper from participating

in the military reserves. Id. The challenged reassignment, 

based solely on reservist obligations, thus violated VRRA 

2021(b)(3). Accordingly, the Carlson panel ordered the trooper 

"restored to his former work assignment." See id. (citing VRRA  

2022). 

As an "outright demotion[] involve[s] reductions in pay

and official rank," Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 

1209, 1218 n.8 (1st Cir. 1989) (en banc), a constructive reduc-

tion in pay or rank ("constructive demotion") would constitute an

employment action sufficiently "like demotion" to satisfy the

severity standard imposed by Monroe, 452 U.S. at 559. See Clark 

v. Township of Falls, 890 F.2d 611, 618 (3d Cir. 1989) ("Actual 

reduction in rank is effected by a change in job title. When the

. . . job title has not been altered . . , we must look to other

traditional indicia of change in rank to determine whether the

employee's rank constructively has been reduced."). Suggested

indicia for determining whether challenged employment actions

constitute a "constructive demotion" include duty assignments

normally given to lower level employees, substantial reductions

in work responsibilities, "termination of privileges of rank, and

11

whether the changes or restrictions are temporary." Id. For 

example, the trooper in Carlson was not formally reduced in rank, 

but nonetheless underwent a constructive reduction in rank as a

result of his assignment from an eight-hour weekday shift to a

nine-hour shift which included weekend duty. See Carlson, 609 

F.2d at 1027. Thus, reassignment to a substantially less favor-

able work schedule deprived Carlson of a privilege of rank,

resulting in a constructive demotion because of his reservist

duties, in violation of VRRA 2021(b)(3).

The summary judgment record discloses that Diaz had

been subjected to adverse changes in work conditions as well,

upon return from active duty with the Army Reserves. First, he

lost substantial privileges of rank, in that he was assigned a

work station, with no desk or chair, in a cubicle filled with

boxes and office supplies. On four occasions in 1991 alone,

either before or during military leaves, his desk and belongings

were relocated apart from all his co-workers. In early 1992,

Diaz, alone among his co-workers, was provided with no telephone

whatsoever. Second, Diaz' job responsibilities had been reduced

to the point that by early 1992 all his work duties had been 

assigned to others. Thus, for five consecutive weeks during this

period, Diaz was given no work duties at all. Cf. Agosto-de- 

Feliciano, 889 F.2d at 1219 (holding that reduction in work 

duties must extend beyond a "week or two" before it will be

considered sufficiently severe to be actionable in First Amend-

ment "political discrimination" context); compare Township of 

12

Falls, 890 F.2d at 618 (holding that a partial reduction in 

duties during six-week period constituted temporary reassignment

insufficient to support procedural due process claim under

Fourteenth Amendment). Third, Diaz was "left in limbo" as to his

actual rank, since he was without a job description for six years

and given no work responsibilities for weeks at a time. Once

work assignments resumed, moreover, Diaz was not informed as to

their grade level. 

Viewing the competent evidence, and all reasonable

inferences therefrom, in the light most favorable to Diaz, we

conclude that he generated a trialworthy issue of material fact

as to whether the cumulative effect of these adverse employment

actions was enough "like demotion" to be actionable under VRRA 

2021(b)(3). A reasonable trier of fact could find that Diaz was

subjected to adverse work-condition changes, extending over more

than five years and amounting to constructive reductions in rank,

that could deter continued participation in the military re-

serves. Thus, Diaz made out a prima facie case that he had been

denied "incident[s] or advantage[s] of employment" within the

meaning of VRRA 2021(b)(3). 

B. "Motivated Solely By Reserve Status" B. "Motivated Solely By Reserve Status 

The VRRA affords recourse for certain discriminatory

employment actions against employee-reservists taken "solely

because of their military obligations." Monroe, 452 U.S. at 

13

565.7 As there is scant evidence that the alleged adverse

employment actions against Diaz were other than reservist-status

based, we conclude that there is sufficient evidence, if credit-

ed, to meet the second criterion under VRRA 2021(b)(3) as

well.8 

Diaz proffered considerable circumstantial evidence 

that the challenged actions were motivated by his reservist

obligations. For example, following his return from active

reserve duty in 1987, he was assigned to a cubicle filled with

boxes and office supplies, with no desk or chair. Again, in

1991, upon returning from reserve duty, he underwent repeated

relocations to work stations apart from all co-workers. After

returning from reserve training in 1992, he was assigned no work

responsibilities for five consecutive weeks. See also supra at 

 

7Even though the Monroe Court (5-4) was sharply divided, the 
Justices were as one on the central question presented here. All
agreed, at a minimum, that VRRA 2021(b)(3) prohibits certain
discriminatory employment actions motivated by the plaintiff- 
employee's reservist status. Their disagreement concerned only
whether reservists are entitled to preferential work-schedule 
accommodations by reason of their military training responsibili-
ties. Diaz, on the other hand, alleges discriminatory employment 
actions based on his responsibilities as a reservist.

8Upon remand, the district court must determine whether any
uncontroverted material facts are to be deemed established. See 
Fed. R. Civ. P. 56(d). We note that the exact burden allocation
regimen appropriate for application to a VRRA claim at summary
judgment has not been addressed by the parties or the district
court. Furthermore, though Diaz now contends that USERRA 4311
applies retroactively to the present case, he made no such
contention below, nor does he now contend that the USERRA pre-
scribes the burden allocation regimen for these VRRA claims.
Consequently, we decline to volunteer our views on these matters
in the present vacuum. See Credit Francais Int'l., S.A., 78 F.3d 
at 709. 

14

pp. 12-13. 

Diaz also proffered direct evidence of a reservist- 

based discriminatory animus on the part of the RWA, including his

deposition testimony that Regional Director Castro-Mundo, in

demanding improved performance, criticized Diaz for wasting a lot

of time on official matters, including military exercises. Diaz

further states that Supervisor Figueroa informed him that the

reason Diaz had no telephone was that he was on "one of those

damn military leaves" when the telephone company representative

came. 

15

Viewed in context, this evidence cannot be dismissed

simply as "stray remarks in the workplace . . . , statements by

nondecisionmakers, or statements by decisionmakers unrelated to

the decisional process itself," Price Waterhouse v. Hopkins, 490 

U.S. 228, 277 (1989) (O'Connor, J., concurring), particularly

since these statements are attributed to supervisors or office

directors with apparent authority to affect Diaz' work conditions

in a significant manner through work-station, work-condition,

equipment, and job assignments, as well as performance evalua-

tions. The statement attributed to Supervisor Figueroa, in

particular, could support a fair inference that the discriminato-

ry work conditions, viz., the total denial of a telephone and 

work assignments, as well as repeated work-station changes, were

directly linked to Diaz' reservist status and responsibilities. 

Furthermore, for their part defendants offer no expla- 

nation for not providing Diaz with either a desk or a chair for

an entire month following his return from military leave in 1987.

As for the disparaging remarks made to Diaz by Supervisor Freses

in 1988, relating to the military and to Diaz' military exercises

in particular, the defendants merely point out that Diaz has

acknowledged that these remarks took the outward form of "jokes." 

Thus, defendants tender no compelling basis upon which to con-

clude that a factfinder could not reasonably infer a discrimina-

tory reservist-based motivation from the direct and circumstan-

tial evidence proffered by Diaz. 

16

Similarly, defendants offer no explanation for refusing 

to assign Diaz work responsibilities for a total of five weeks

during a ten-week period following his return from military leave

in 1992, notwithstanding the fact that the manager of the Partic-

ipant Services Division, to which Diaz was assigned at the time,

advised the Director of the Occupational Orientation Division, in

writing, that "non-use of [Diaz] is not productive nor advisable

for the best welfare of the Occupational Orientation Division."

To this point, therefore, defendants have met Diaz' competent

direct and circumstantial evidence with neither evidence nor

explanation which would compel a reasonable trier of fact to find

that the challenged employment actions were not motivated solely

by Diaz' reservist obligations. Thus, summary judgment was

precluded on the present record. 

C. Eleventh Amendment Immunity  C. Eleventh Amendment Immunity  

The Eleventh Amendment immunity defense to the claim

for damages fails as well. As this court held in Reopell v. 

Massachusetts, 936 F.2d 12, 16 (1st Cir.), cert. denied, 502 U.S. 

1004 (1991), Congress, acting pursuant to its War Powers, see 

U.S. Const. art. I, 8, "removed the Eleventh Amendment bar to

damages actions brought under [the VRRA] . . . ." Since no

subsequent development has undermined Reopell, we remain bound by 

it. Williams v. Ashland Eng'g Co., 45 F.3d 588, 592 (1st Cir.), 

cert. denied, 116 S. Ct. 51 (1995).9 Accordingly, defendants 
 

9The recent decision in Seminole Tribe of Florida v. Flori- 
da, 116 S. Ct. 1114 (1996), which overrules Pennsylvania v. Union 
Gas Co., 491 U.S. 1 (1989), and holds that Congress lacks the 

17

are not entitled to Eleventh Amendment immunity from suit for

compensatory damages under VRRA 2021(b)(3).

III III

CONCLUSION CONCLUSION 

We therefore hold that an employee-reservist may assert

a claim under VRRA 2021(b)(3) based on constructive demotion,

i.e., a discriminatory employment action, "like demotion," in the

nature of a constructive reduction in rank and motivated solely

by participation in the reserves. Furthermore, viewing the

competent evidence most favorably to Diaz, a reasonable trier of

fact could find that Diaz was constructively reduced in rank

based solely on his reservist participation and obligations.

Finally, we conclude that the Eleventh Amendment does not immu-

nize defendants from suit under VRRA 2021(b)(3). Accordingly,

the district court judgment is vacated and the case is remanded

for further proceedings consistent with this opinion. 

So ordered. Costs to appellant. So ordered. Costs to appellant. 

 

power to abrogate the Eleventh Amendment under the Commerce
Clause, does not control the War Powers analysis. See CEH, Inc. 
v. F/V Seafarer, 70 F.3d 694, 702 (1st Cir. 1995) ("[W]e are 
hesitant to ascribe to the Court a holding that goes well beyond
any issue discussed there."). 

18