USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT  ____________________ No. 95-1731 MARY McCABE, ETC., Plaintiff, Appellee, v. LIFE-LINE AMBULANCE SERVICE, INC., Defendants, Appellees,  ________ THE CITY OF LYNN, Defendant, Appellant.  ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Nancy Gertner, U.S. District Judge] ___________________  ____________________ Cyr, Boudin and Stahl, Circuit Judges. ______________  ____________________ Charles M. Burnim, with whom Michael J. Barry and George S. _________________ ________________ _________ Markopoulos were on brief for appellant. ___________ Charles M. Campo, Jr., with whom Floyd H. Anderson and Kassler & _____________________ _________________ _________ Feuer, P.C. were on brief for appellee McCabe. ___________  ____________________ February 29, 1996  ____________________ CYR, Circuit Judge. In this appeal by the City of Lynn CYR, Circuit Judge. _____________ ("City"), we consider whether an established City policy, permit- ting forcible, warrantless entries of private residences to enforce involuntary civil commitment orders, violates the Fourth Amendment to the United States Constitution. The district court granted summary judgment for plaintiff Mary McCabe, administra- trix of the estate of Ruchla Zinger, a Holocaust survivor who died in her Lynn home during a tragic attempt by City police to execute an involuntary commitment order which had been issued against her. For the reasons discussed in this opinion, we conclude that the challenged City policy came within an exception to the Fourth Amendment warrant requirement.  I I BACKGROUND BACKGROUND __________ Ms. Zinger, a 64-year-old Lynn, Massachusetts, resident with a history of mental illness and psychiatric hospitalization, as well as severe obesity and high blood pressure, resisted all attempts at communication and intervention by family members. She refused to be examined by a doctor after threatening her former husband with physical harm and upsetting her downstairs neighbors by causing loud and violent disturbances in her apart- ment, thereby prompting her family to initiate eviction proceed- ings against her.1 Subsequently, on September 6, 1989, a li- censed psychiatrist, Dr. Jakov Barden, signed an application  ____________________ 1Ms. Zinger's former husband and their children owned the  building in which Ms. Zinger's apartment was located. 2 [hereinafter: "pink paper"] for a ten-day involuntary commitment of Ms. Zinger pursuant to Mass. Gen. Laws Ann. ch. 123, 12(a), based exclusively on the reports of family members and neighbors as to Ms. Zinger's physical and behavioral symptoms.  The next morning, Constable Kenneth Jackson, who had been unsuccessful in previous attempts to serve Ms. Zinger with an eviction notice, and was scheduled to execute a judgment of eviction against her at 1:00 p.m. that afternoon, learned that the pink paper had been issued against Ms. Zinger the night before, and contacted the Lynn police department. The constable informed the Lynn police, based on his experience with Ms. Zinger, that he believed she would resist committal. The consta- ble and the Lynn police officers arranged to meet at the Zinger apartment building at 1:00 p.m., to execute the pink paper and the eviction order.  Three Lynn police officers and the constable arrived at the Zinger apartment building at the appointed hour, accompanied by a crew from the Life-Line Ambulance Service, which had been engaged to restrain Ms. Zinger as necessary, physically remove her from the apartment, and transport her to the hospital. After receiving no response to their knocks, the officers kicked in the outside apartment-house door and proceeded upstairs to the Zinger apartment. The officers knocked and announced their presence, received no response, and began to kick in the Zinger apartment door. Ms. Zinger began screaming "Why are you kicking in my door?" then cracked it open. Identifying themselves as police, 3 the officers told her that they were going to bring her under medical care, to which she responded: "No doctors!" When she began to close the door, the officers shoved their way inside. Later, while the officers were forcibly removing her from the apartment, Ms. Zinger suffered a cardio-respiratory arrest and died.2  After McCabe, as administratrix, instituted this civil rights action under 42 U.S.C. 1983 against the City, amongst others,3 in September 1992, an amended complaint alleged an  ____________________ 2The only constitutional violation McCabe attributes to the City is the forcible warrantless entry. In her cross-motion for summary judgment, McCabe did not press her "excessive force" claim that a City policy authorized or caused the police actions utilized to restrain Ms. Zinger. See infra note 4. We now ___ _____ summarize the allegations against the individual officers in order to provide additional context.  After the officers pushed their way into her apartment and Ms. Zinger began screaming, the officers forced her to the floor on her stomach and handcuffed her hands behind her back. She lost control of her bladder. The ambulance crew refused to carry her down the stairs, asserting that she was too heavy. The officers then placed her in a sitting position. With one officer gripping her ankles and another holding her under her handcuffed arms, she was carried to the stairs, then dragged down one step at a time while still in a sitting position. At the bottom, the ambulance crew strapped her onto the stretcher, face down. By this time she had stopped screaming and the officers noticed that her hands appeared blue and she was bleeding from her mouth. Ms. Zinger was pronounced dead on arrival at the hospital. 3The judgment appealed from is nonetheless "final" as to all parties and claims. See Fed. R. Civ. P. 54(b); 28 U.S.C. 1291. ___ The original ten-count complaint named as defendants, the City, the dispatching police supervisor and the three individual police officers who executed the pink paper (in their official and individual capacities), the constable, the ambulance company, the ambulance crew, Dr. Barden, and the Tri-City Mental Health and Retardation Center where Dr. Barden worked. In addition to her claims under 1983, McCabe alleged common-law assault and battery, and negligence. In June 1993, McCabe settled all claims against the doctor and the hospital. In February 1995, after a jury returned verdicts against the City and Life-Line Ambulance, 4 established City policy permitting police officers to execute pink papers by means of forcible, warrantless entries into private residences absent demonstrable exigent circumstances, and that this City policy proximately caused an actionable depriva- tion of Ms. Zinger's Fourth Amendment right to be free from unreasonable searches.4 After hearing, the district court granted the McCabe cross-motion for summary judgment against the City on the issue of liability. McCabe v. City of Lynn, 875 F. ______ ____________ Supp. 53, 63 (D. Mass. 1995). In the ensuing trial, the jury awarded $850,000 in damages against the City and $500,000 against Life-Line Ambulance. The City thereupon brought this appeal from the final judgment entered against it.  II II DISCUSSION DISCUSSION __________ A. District Court Opinion A. District Court Opinion ______________________ The district court found that the City policy violated the Fourth Amendment, for the following reasons. The City's own policy expert attested that the City did not require its officers to obtain a search warrant before effecting a warrantless entry of a residence to execute a pink paper, leaving it instead to the discretion of the officers whether and when such a warrantless  ____________________ the claims against the four police officers, the constable, and the ambulance crew were dismissed, without prejudice, by stipula- tion.  4By contrast, the initial complaint had alleged a City policy permitting the use of excessive force, and a failure to train or supervise officers, in executing involuntary commitment seizures. 5 entry was necessary. Id. at 58. The district court noted that __ warrantless, nonconsensual entries into private residences are presumptively "unreasonable" under the Fourth Amendment, absent exigent circumstances. Id. at 58-59. Although imminent threats ___ to the lives and safety of the police officers, or members of the public, often give rise to exigent circumstances justifying an immediate warrantless entry, the court found that "the Lynn police acted with leisure in arranging a convenient time" to _______ serve the pink paper upon Ms. Zinger, thereby belying any conten- tion that "'some real[,] immediate or serious consequences [would occur] if [the officers] postponed action to get a warrant.'" Id. at 59, 62 (citation omitted).  ___ The district court nonetheless recognized that even absent exigent circumstances the warrant requirement may not be applicable in certain regulatory contexts wherein warrantless search procedures serve as invaluable "administrative tool[s]" and are "far less invasive" than searches directed at discovering evidence of crime. Id. at 59-60. The court identified two ___ factors which weighed against a ruling that the challenged City policy came within this special regulatory category. First, unlike a judicial officer, the licensed medical-psychiatric physicians authorized to issue pink papers under Mass. Gen. Laws Ann. ch. 123, 12(a), are "not qualified to determine whether probable cause exists." Id. at 61. Second, "the agents of the ___ doctors in this case are police officers with guns and batons, not hospital orderlies and nurses," so that "[t]here is no 6 therapeutic relationship which a warrant mechanism would dis- rupt." Id. ___ B. Standard of Review B. Standard of Review __________________ We review a grant of summary judgment de novo, to __ ____ determine whether "the pleadings, depositions, answers to inter- rogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Velez-Gomez v. SMA ___ ___________ ___ Life Assurance Co., 8 F.3d 873, 874-75 (1st Cir. 1993). All ___________________ competent evidence and reasonable inferences therefrom are viewed in the light most favorable to the party resisting summary judgment. Id.  ___ C. Applicable Law C. Applicable Law ______________ A municipal liability claim under 1983 requires proof that the municipality maintained a policy or custom which caused, or was the moving force behind, a deprivation of constitutional rights. See, e.g., Oklahoma City v. Tuttle, 471 U.S. 808, 819 ___ ____ _____________ ______ (1985); Monell v. Department of Social Servs., 436 U.S. 658, 694 ______ ___________________________ (1978); Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir.), _________ ______ cert. denied, 493 U.S. 820 (1989).  _____ ______ The Fourth Amendment applies not only to governmental searches and seizures in criminal investigations, but also in various civil proceedings. See Soldal v. Cook County, Ill., 506 _____ ___ ______ _________________ U.S. 56, __, 113 S. Ct. 538, 548 (1992); O'Connor v. Ortega, 480 ________ ______ U.S. 709, 715 (1987) ("[B]ecause the individual's interest in 7 privacy and personal security `suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards,' . . . it would be `anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.'") (quoting New ___ Jersey v. T.L.O., 469 U.S. 325, 335 (1985)). Included among the ______ ______ civil proceedings in which the Fourth Amendment applies are involuntary commitment proceedings for dangerous persons suffer- ing from mental illness. See Glass v. Mayas, 984 F.2d 55, 58 (2d ___ _____ _____ Cir. 1993); Villanova v. Abrams, 972 F.2d 792, 795-96 (7th Cir. _________ ______ 1992). The fundamental inquiry under the Fourth Amendment is whether a particular search or search procedure is "reasonable" in the circumstances. See Cady v. Dombrowski, 413 U.S. 433, 439- ___ ____ __________ 40 (1973); Wyman v. James, 400 U.S. 309, 318 (1971); Camara v. _____ _____ ______ Municipal Ct. of San Francisco, 387 U.S. 523, 538 (1967). _________________________________ Nonconsensual entries by government agents into a residence without a search or arrest warrant5 are presumptively "unreason- able" under the Fourth Amendment. See Welsh v. Wisconsin, 466 ___ _____ _________ U.S. 740, 748-49 (1984); Payton v. New York, 445 U.S. 573, 586 ______ _________ (1980); Hegarty v. Somerset County, 53 F.3d 1367, 1373 (1st _______ ________________  ____________________ 5"[A] [felony] arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton v. New York, 445 U.S. ______ _________ 573, 603 (1980). But see Steagald v. United States, 451 U.S. 204, ___ ___ ________ _____________ 214 (1981) (noting that the "arrest warrant" rule is inapplicable where suspect is within another person's residence). 8 Cir.), cert. denied, 116 S. Ct. 675 (1995). This presumption is _____ ______ designed to safeguard the special privacy expectations tradition- ally recognized in the American home by requiring that a "neu- tral" and detached judicial officer make an independent assess- ment as to whether law enforcement agents have probable cause to effect an intended search or arrest within the home. See Stea- ___ _____ gald v. United States, 451 U.S. 204, 212 (1981). The warrant ____ ______________ requirement is not absolute, of course, and the presumption may be overcome in at least two ways. First, a warrantless entry and search of a residence may be "reasonable," in Fourth Amendment terms, if the government can demonstrate certain exceptional types of "exigent circum- stances": (1) "hot pursuit" of a felon into a residence; (2) imminent destruction of evidence within the residence; (3) a threatened and potentially successful escape by a suspect from inside the residence; or (4) an imminent threat to the life or safety of members of the public, the police officers, or a person located within the residence. See United States v. Tibolt, 72 ___ _____________ ______ F.3d 965, ___ (1st Cir. 1995) [Nos. 94-1714 & 2221, 1995 WL 757848, at *3 (Dec. 29, 1995)]; Hegarty, 53 F.3d at 1374. _______ Normally, "exigent circumstances" exceptions by their very nature turn upon the objective reasonableness of ad hoc, fact- __ ___ specific assessments contemporaneously made by government agents in light of the developing circumstances at the scene of the search. See id. at 1378. ___ ___ Second, a residential search pursuant to an established 9 warrantless search procedure may be reasonable if conducted in _________ furtherance of an important administrative or regulatory purpose, or "special need," which would be undermined systemically by an ____________ impracticable warrant or probable-cause requirement. Griffin v. _______ Wisconsin, 483 U.S. 868, 873 (1987) ("[W]e have permitted excep- _________ tions when `special needs, beyond the normal need for law en- forcement, make the warrant and probable-cause requirement impracticable.'") (citation omitted). See, e.g., id. (upholding ___ ____ ___ probation officers' prerogative to conduct warrantless searches of probationers' homes for evidence of probation infraction); O'Connor, 480 U.S. at 709 (noting that government employer's ________ warrantless searches of employees' work space to recover work- related materials may be "reasonable" in particular circumstanc- es); T.L.O., 469 U.S. at 325 (holding that warrantless in-school ______ searches of students' personal property by public school offi- cials did not violate Fourth Amendment); United States v. Car- _____________ ____ dona, 903 F.2d 60 (1st Cir. 1990) (extending Griffin to parole ____ _______ officers' warrantless searches of parolees' residences), cert. _____ denied, 498 U.S. 1049 (1991); cf. Wyman, 400 U.S. at 309 (holding ______ ___ _____ that social worker's warrantless visitation to welfare recip- ient's home did not implicate Fourth Amendment). The reasonable- ness of a particular "special need" search procedure will depend, of course, on whether the court's "careful balancing of govern- mental and private interests suggests that the public interest is best served by a Fourth Amendment standard that stops short of probable cause." T.L.O., 469 U.S. at 341.  ______ 10 D. Alleged "Deprivation" D. Alleged "Deprivation" _____________________ Turning to the initial hurdle confronting McCabe under 1983, see Monell, 436 U.S. at 694, we must determine whether ___ ______ the undisputed evidence demonstrates that the warrantless, forcible entry of the Zinger residence by the Lynn police consti- tuted a deprivation of decedent's Fourth Amendment rights. Oddly, none of the cases the City cites as support for the constitutionality of comparable involuntary commitment statutes deals straightforwardly with the precise issue before us: whether a prescribed statutory search procedure (i.e., Mass. Gen. Laws Ann. ch. 123, 12(a)) violates the Fourth Amendment because it routinely allows warrantless entries of a residence, absent "exigent circumstances," to effect involuntary commitments; nor have we found such a case. The cases cited by the City consider whether a seizure of the person effected pursuant to an involun- ______ tary commitment statute violates the due process requirements of ___ _______ the Fifth and Fourteenth Amendments,6 or whether the manner in which the government detains a person violates the Fourth Amend- ment prohibition against unreasonable seizures.7 Nonetheless,  ____________________ 6See, e.g., Project Release v. Prevost, 722 F.2d 960, 963 ___ ____ _______________ _______ (2d Cir. 1983) (involving a Fourteenth Amendment "due process" challenge to the New York involuntary commitment statute). 7See Moore v. Wyoming Medical Ctr., 825 F. Supp. 1531, 1535, ___ _____ ____________________ 1537 (D. Wyo. 1993) (focusing on "seizure" of person subjected to involuntary commitment, and noting only in passing that seizure followed a forcible warrantless entry of the home); see also ___ ____ Glass, 984 F.2d at 58 (holding that the committing physicians _____ were entitled to qualified immunity for ordering "seizure" because they reasonably believed that subject was mentally ill and "dangerous"); Villanova, 972 F.2d at 797 (discussing Fourth _________ Amendment and due process implications arising from prolongation 11 to the extent the technically inapposite "seizure" cases relied on by the City might be considered appropriate analogs in this unchartered area, we consult their reasoning for guidance.  Although the parties devote considerable attention to whether there remains a genuine factual dispute regarding the substance of the challenged City "policy," we consider its essential features clear enough; that is, the policy permits warrantless residential searches, without requiring "exigent circumstances," in order to effect an involuntary commitment pursuant to a properly issued pink paper. Of course, the City argues that every entry is per se "exigent" since a pink paper ___ __ can only issue upon an expert medical finding that the subject presently poses a "likelihood of serious harm" to herself or others, which in turn provides the police with reasonable cause to believe that an immediate, forcible entry for the purpose of  ____________________ of involuntary commitment, or seizure of the person, without independent judicial determination of probable cause, where commitment occurred while person was in jail). ____ Moreover, the absence of any authority for the McCabe contention that the warrantless "forcible entry" phase of an involuntary commitment should be treated differently than the committal "seizure" itself arguably indicates that a constitu- tional foundation is lacking. See Cardona, 903 F.2d at 64 ___ _______ (rejecting similar attempt to draw "entirely artificial distinc- tion[s] between `search' jurisprudence and `seizure' jurispru- dence"). And since the cases cited by the City overwhelmingly hold that warrantless, involuntary commitment seizures generally comport with the strictures of the Fourth Amendment, see Vil- ___ ____ lanova, 972 F.2d at 795 ("There is no requirement of a warrant ______ issued by a judicial officer [to seize the person subject to a commitment order]."), thus constituting a valid pink paper the practical equivalent of an arrest warrant, see supra note 5; cf. ___ _____ ___ Welsh, 466 U.S. at 748-49; Payton, 445 U.S. at 586; Hegarty, 53 _____ ______ _______ F.3d at 1373, a separate requirement that a search warrant be obtained before entering the residence to seize the subject could be viewed as supererogatory. 12 detaining the resistant subject is necessary to avert the "seri- ous harm" identified in the pink paper.  On the other hand, McCabe contends that these remote medical-psychiatric "emergency" determinations do not equate with constitutionally cognizable "exigent circumstances," because they do not turn on the executing officer's fact-specific, on-the- scene assessment as to the immediacy of any putative threat the subject may pose to herself or others. McCabe stresses that during the several hours which were allowed to elapse before the pink paper was executed upon Ms. Zinger, the officers would have had ample time to obtain a search warrant. And McCabe points out that none of the four recognized "exigent circumstances," see ___ supra p. 10, was plainly present immediately before the forcible _____ police entry. As these claims reflect the legal gloss placed on the record evidence, rather than a genuine factual dispute concerning the substance of the City policy, we need not enter the skirmish over the distinctions between "emergencies" and "exigent circumstances." The City policy, as evidenced by the actual conduct of its police officers,8 falls squarely within a recognized class of systemic "special need" searches ________  ____________________ 8Contrary to McCabe's contention, we need not decide whether the City waived the argument that its police officers' actions were not undertaken pursuant to City policy, and that it is therefore not liable under Monell, 436 U.S. at 694. The City ______ merely argues that the actual police conduct in effecting a warrantless entry often provides the best circumstantial evidence as to the nature of the challenged municipal policy. See Bor- ___ ____ danaro, 871 F.2d at 1156-57 (observing that the event itself is ______ evidence that police officers acted in accordance with municipal policy).  13 which are conducted without warrants in furtherance of important administrative purposes. Again, the fundamental concern of Fourth Amendment jurisprudence in general, and in "special need" search cases as well, is whether an established search procedure is "reasonable" in light of the actual circumstances in the particular case. See Cady, 413 U.S. at 439-40; see also O'Con- ___ ____ ___ ____ ______ nor, 480 U.S. at 719; T.L.O., 469 U.S. at 337. "Reasonableness," ___ ______ in turn, depends on "'balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" O'Connor, 480 U.S. at 719 (citation omitted); ________ see T.L.O., 469 U.S. at 341; Cardona, 903 F.2d at 67; cf. Vil- ___ ______ _______ ___ ____ lanova, 972 F.2d at 796. On balance, we find that the City ______ policy permitting forcible, warrantless entries by police offi- cers in possession of a pink paper properly issued pursuant to Mass. Gen. Laws Ann. ch. 123, 12(a), is reasonable under the Fourth Amendment.  1. State's "Administrative" Interest 1. State's "Administrative" Interest _________________________________ (a) Parens Patriae and Police Power (a) Parens Patriae and Police Power _______________________________ The legitimacy of the State's parens patriae and ______ _______ "police power" interests in ensuring that "dangerous" mentally ill persons not harm themselves or others is beyond dispute. See ___ Rogers v. Okin, 634 F.2d 650, 654 (1st Cir. 1980), rev'd on other ______ ____ _____ __ _____ grounds, 457 U.S. 291 (1982); Thompson v. Commonwealth, 438 _______ ________ ____________ N.E.2d 33, 36 (Mass. 1982). The potential consequences attending a delayed commitment both to the mentally ill subject and 14 others may be extremely serious, sometimes including death or bodily injury. Thus, we think it is especially significant to the present analysis that warrantless "special need" searches have been condoned by the courts in circumstances where the State interests were far less compelling and urgent. Cf., e.g., ___ ____ O'Connor, 480 U.S. at 724 (noting: because "public employees are ________ entrusted with tremendous responsibility," "the consequences of their misconduct or incompetence to both the agency and the public interest can be severe"); New York v. Burger, 482 U.S. ________ ______ 702, 708-09 (1987) (noting: where "the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reason- able[,]" and that "the State has a substantial interest in regulating the vehicle-dismantling and automobile-junkyard industry because motor vehicle theft has increased in the State and because the problem of theft is associated with this indus- try"); T.L.O., 469 U.S. at 339 ("Against the child's interest in ______ privacy must be set the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds.").  We therefore inquire whether these residential search procedures are appropriately tailored to the legitimate and important interests at stake; in other words, whether the proce- dures are reasonably designed to ensure accurate identification and prompt detention of recalcitrant and "dangerous" mentally ill persons who require immediate temporary commitment. See id. at ___ ___ 15 341 (noting two-part inquiry whether the search procedure was (i) "'justified at its inception'" and (ii) "'reasonably related in scope to the circumstances which justified the interference in the first place'") (citations omitted).9 We think that Mass. Gen. Laws Ann. ch. 123, 12(a), in general, and the commitment order issued by Dr. Barden, in particular, were appropriately suited to these legitimate purposes.  The application for temporary hospitalization, signed by Dr. Barden, expressly referenced Mass. Gen. Laws Ann. ch. 123, 12(a), which authorizes four categories of involuntary commit- ment procedures:  (1) a qualified physician, psychologist, or psychiatric nurse who has personally examined a person, and who has reason to believe that the person would create a "likelihood of serious harm," may sign a "pink paper" authorizing law enforcement officials to restrain that person to permit hospitalization for up to a ten- day period; (2) in an "emergency situation," a qualified physician, psychologist, or psychiatric nurse may sign a pink paper, even when the alleged mentally ill person refuses to submit to a medical examination, if the "facts and circumstances" suggest that the person would create a "likeli- hood of serious harm"; (3) in an "emergency situation," a police officer may restrain a person he be- lieves creates a "likelihood of serious harm," if no qualified physician, psy-  ____________________ 9Thus, a "mental illness" determination alone is insuffi- cient to support an involuntary commitment order; the State must also show that the person subjected to involuntary commitment is "dangerous." See O'Connor v. Donaldson, 422 U.S. 563, 575-76 ___ ________ _________ (1975).  16 chologist, or psychiatric nurse is a- vailable to sign a pink paper; or (4) at any time, any person may apply to the district or juvenile courts for a com- mitment order, and after a hearing, the court may issue a warrant for the appre- hension and appearance of the person who creates a "likelihood of serious harm." Mass. Gen. Laws Ann. ch. 123, 12(a); see infra Appendix, for ___ _____ text; see generally Rockwell v. Cape Cod Hosp., 26 F.3d 254, 258- ___ _________ ________ ______________ 60 (1st Cir. 1994) (tracing history of Massachusetts emergency involuntary commitment procedure from colonial times through enactment of chapter 123). As only the category 4 commitment procedure expressly incorporates a warrant requirement, we think it clear that the statute implicitly authorizes warrantless searches and seizures in the three remaining contexts. Since Ms. Zinger repeatedly rejected family pleas that she submit to examination by a physician, and because Dr. Barden based his expert medical-psychiatric opinion exclusively on reports from family members and neighbors, we conclude also that the pink paper in this case did issue under category 2. The only question before us, therefore, concerns the constitutionality of the "category 2" warrantless search procedure.  The pink paper was based on Dr. Barden's expert opinion that Ms. Zinger "require[d] hospitalization so as to avoid the likelihood of serious harm by reason of mental illness." Dr. Barden described the particular grounds for concluding that immediate hospitalization was required: [Patient] has a [history] of mental illness and she was hospitalized at Danvers [State] 17 Hospital couple of years ago. [Patient] is very angry and hostile; she is very impulsive and explosive. She made threats to harm her ex-husband. [Patient] is dangerous to oth- ers. The involuntary commitment application, and the Massachusetts statute, define "likelihood of serious harm" the governing criterion for commitment as:  (1) a substantial risk of physical harm to the person [her]self as manifested by evi- dence of, threats of, or attempts at, suicide or serious bodily harm; (2) a substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior or evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them; or (3) a very substantial risk of physical impairment or injury to the person [her]self as mani- fested by evidence that such person's judg- ment is so affected that [s]he is unable to protect [her]self in the community and that reasonable provision for h[er] protection is not available in the community. Mass. Gen. Laws Ann. ch. 123, 1; see Rogers, 634 F.2d at 658. ___ ______ The relevant medical history, including Ms. Zinger's history of mental illness and prior hospitalization at Danvers State Hospi- tal, and the behavioral symptoms reported to Dr. Barden by family members, plainly satisfied the second clause in the statutory definition of "likelihood of serious harm."  The statutory definition of "likelihood of serious harm," particularly its requirement that there be objective medical indicia of "dangerousness," effectively "constitutes a codified set of `exigent circumstances' which are constitutional under the Fourth Amendment." Moore v. Wyoming Medical Ctr., 825 _____ ____________________ F. Supp. 1531, 1538 n.4, 1546 (D. Wyo. 1993). Given the notori- 18 ous difficulties in predicting individual human behavior based solely on symptomatology, id. at 1539, we conclude that Mass. ___ Gen. Laws Ann. ch. 123, 1, prescribes a sufficiently clear and reasonably reliable administrative standard for ensuring that involuntary commitments are limited to imminently "dangerous" mentally ill persons in emergent circumstances.  Finally, the specific focus and overall context of the Massachusetts statute implicitly circumscribe the category 2 search procedure within narrow bounds. A police officer is permitted to enter a residence without a warrant for the exclu- sive purpose of detaining a recalcitrant and dangerous mentally ill person pursuant to a duly issued pink paper, but may not engage in a generalized search. As the officers in the instant case did not exceed these bounds, we conclude that Mass. Gen. Laws Ann. ch. 123, 12(a), and consequently the City policy in pursuance of the statutory design, see supra pps. 12-14, are ___ _____ appropriately tailored to serve the legitimate and important State and municipal interest in ensuring that dangerous mentally ill persons not cause physical harm to themselves or others. (b) Practicality of Warrant Requirement (b) Practicality of Warrant Requirement ___________________________________ The determination that there exists a legitimate and substantial governmental interest in conducting a warrantless search in certain circumstances satisfies only the threshold inquiry under the reasonableness test. For an administrative search procedure to survive constitutional challenge under the "special need" exception, it must also appear that the burdens of 19 complying with a warrant requirement are likely to defeat the important governmental purposes the warrantless search procedure was designed to serve.  In assessing whether the public interest demands creation of a general exception to the Fourth Amendment's warrant requirement, the question is not whether the public inter- est justifies the type of search in question, but whether the authority to search should be evidenced by a warrant, which in turn depends in part upon whether the burden of obtaining a warrant is likely to frustrate the govern- mental purpose behind the search.  Camara, 387 U.S. at 533. ______ Compliance with a warrant requirement in the context of these temporary, involuntary commitments for medical-psychiatric examination would entail critical delays in safeguarding the mentally ill person, and others, without affording commensurate privacy protections to the subject. Category 2 searches foster important governmental interests largely because the inherent imprecision in predicting the timing of any outbreak of "danger- ousness" on the part of the recalcitrant, mentally ill person, see Moore, 825 F. Supp. at 1539, inevitably means that the time ___ _____ spent securing judicial approval of a pink paper represents a potentially dangerous delay of incalculable proportion.  ____________ In this particular case, of course, McCabe points to the undisputed evidence that the police officers waited several hours before executing the pink paper, thus demonstrating little concern that Ms. Zinger might exhibit the sort of sudden onset of "dangerousness" alluded to in the assessment made by Dr. Barden. Although this argument might hold sway were the constitutionality 20 of the warrantless entry dependent on an ad hoc, on-the-scene __ ___ "exigent circumstances" determination made by the police, it is no rejoinder to the claimed "reasonableness" of a "special need" search procedure policy, which must focus not on the particular case but on the essential systemic attributes of the search procedure itself:  The dissent argues that in this case the police had ample time to secure an arrest warrant, rendering invalid any claim that complying with traditional fourth amendment requirements was impracticable. That view- point distorts Griffin's "impracticability" _______ prong. In Griffin, the Court inquired into _______ the systemic impracticability of compelling ________ ________________ those involved in implementation of a proba- tion regime to obtain warrants. The imprac- ticability of obtaining a warrant in the particular case did not enter into the equa- __________ ____ tion; indeed, Justice Blackmun argued unsuc- cessfully for much the same sort of particu- larized inquiry . . . . Whether it was feasi- ble for the police to obtain a warrant in this particular case is irrelevant for the purpose at hand. Cardona, 903 F.2d at 68 n.7 (emphasis added; citations omit- _______ ted).10 Although the Fourth Amendment warrant requirement  ____________________ 10There is no record evidence that the challenged City policy required officers to execute pink papers within a speci- fied time. In all events, however, we do not think the several hours that elapsed between the issuance and execution of this pink paper, which enabled the constable and police to coordinate their actions, can be considered so inordinate as to call into question the emergent nature of Ms. Zinger's mental-health- related dangerousness. Whereas delay might belie "exigent circumstances," were that the warrant exception primarily relied upon by the City, no such rigid time constraints can be imposed in a particular "special need" case as a precondition to the validity of the systemic search procedure itself. Nonetheless, we express no opinion as to whether, in another case, inordinate delay in issuing and executing a pink paper might tend to under- mine a predicate finding that the subject posed a real "likeli- hood of serious harm" at the time the finding was made.  21 imposes a minimal burden on governmental authorities in normal circumstances, we think there can be little doubt that it would delay the execution of involuntary commitment orders to some ____ degree in all cases, thereby appreciably increasing the systemic ___ risk that the vital protective purposes served by the State's parens patriae and "police power" responsibilities would be ______ _______ frustrated in individual cases not identifiable in advance. See ___ supra Section II.D.1(a). _____ More importantly by far, however, the additional burdens imposed on the City and State by a universal warrant requirement in category 2 searches seem to us "undue" and "unrea- sonable" when viewed in relation to the minimal additional protection afforded by a requirement that a pink paper be screened by a magistrate before it is executed. The district court ruled that the Fourth Amendment warrant requirement was violated notwithstanding compliance with the "pink paper" proce- dure under Mass. Gen. Laws Ann. ch. 123, 12(a), because the issuing physician "is not qualified to determine whether probable cause exists." McCabe, 875 F. Supp. at 61. On the other hand, ______ the Supreme Court has noted that rigid adherence to a warrant requirement reaches its most suspect extreme where a judicial officer lacks the innate expertise to assess the soundness of the basic ground upon which the warrant request is predicated. See, ___ e.g., Griffin, 483 U.S. at 879 n. 6 (observing that "[o]ur ____ _______ discussion pertains to the reasons generally supporting the proposition that the search decision should be left to the 22 expertise of probation authorities rather than a magistrate"); cf. Rogers, 634 F.2d at 660 ("While judicial determinations are ___ ______ certainly preferable in general, room must be left for responsi- ble state officials to respond to exigencies that render totally impractical recourse to traditional forms of judicial process. `The judicial model of fact finding for all constitutionally protected interests, regardless of their nature, can turn ratio- nal decisionmaking into an unmanageable enterprise.'") (quoting Parham v. J. R., 442 U.S. 584, 608 n. 16 (1979)).  ______ __ __ A pink paper is issued or withheld principally on the strength of expert medical-psychiatric assessments (i.e., diagno- ses and prognoses founded on the available evidence), whereas judicial officers normally are called upon to make judgments as to whether there is "probable cause" for an arrest or search. As the Second Circuit has pointed out: "[T]he initial inquiry in a civil commitment proceeding is very different from the central issue in either a delinquency proceeding or a criminal prosecution. In the latter cases the basic issue is a straightforward factual question--did the accused commit the act alleged? There may be factual issues to resolve in a commitment proceeding, but the factual aspects represent only the beginning of the inquiry. Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the meaning of the facts which must _______ be interpreted by expert psychiatrists and psychologists."  Project Release v. Prevost, 722 F.2d 960, 972-73 (2d Cir. 1983) _______ _______ _______ (quoting Addington v. Texas, 441 U.S. 418, 425 (1979)); see also _________ _____ ___ ____ O'Connor, 480 U.S. at 723 ("Indeed, it is difficult to give the ________ 23 concept of probable cause, rooted as it is in the criminal investigatory context, much meaning when the purpose of a search is to retrieve a file for work-related reasons."); Wyman, 400 _____ U.S. at 324 (in the home-visitation setting, "the warrant argu- ment is out of place" since, as a practical matter, "probable cause" is more than an agency seeks or needs to know).11  To be sure, judicial oversight might provide some preliminary insulation against obvious abuse; for example, by screening out patently unreliable information utilized by a physician in formulating a diagnosis or prognosis, which can be a matter of particular concern in category 2 cases where the  ____________________ 11It is largely irrelevant whether the "likelihood of serious harm" criterion in Mass. Gen. Laws Ann. ch. 123, 12(a), approximates the "probable cause" inquiry appropriate in the search warrant context. The "probable cause" inquiry often is jettisoned in civil administrative searches: "[W]here a careful balancing of governmental and private interests suggests that the pub- lic interest is best served by a Fourth A- mendment standard of reasonableness that stops short of probable cause, we have not hesitated to adopt such a standard." We have concluded, for example, that the appropriate standard for administrative searches is not probable cause in its traditional meaning. Instead, an administrative warrant can be obtained if there is a showing that reason- able legislative or administrative standards for conducting an inspection are satisfied. O'Connor, 480 U.S. at 722-23 (citations omitted); see also ________ ___ ____ T.L.O., 469 U.S. at 340-41 ("'[P]robable cause' is not an irre- ______ ducible requirement of a valid search. The fundamental command of the Fourth Amendment is that searches and seizures be reason- able, and although 'both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, ... in certain limited circumstances neither is required.'") (citations omitted).  24 physician has not examined the patient and must rely on second- hand reports as to the subject's physical, emotional and behav- ioral symptoms. On the other hand, the statutory mechanism itself affords reasonable safeguards against such concerns: a pink paper can be authorized only by a licensed psychiatric physician, see Mass. Gen. Laws Ann. ch. 123, 1, 12(a), whose ___ extensive education and specialized experience and training should enable the psychiatric physician more reliably to parse such lay reports, especially those provided by family members, with the requisite professional skepticism.12 Though this safeguard is by no means foolproof, we think it would be the exceptional case in which an expert evaluation was based on patently insufficient or unreliable information. Further, to the ________ degree that judicial factfinding were thought to be necessary as a general rule, in order to ferret out latent unreliability in ______ the foundational evidence (e.g., possible ulterior family motives or antipathy toward the patient) upon which expert psychiatric evaluations are based, the resulting delays in implementing  ____________________ 12The other statutory safeguards would not forestall improp- er warrantless entries of a subject's residence. See Cardona, ___ _______ 903 F.2d at 66 ("While the actual invasion of privacy does not occur until the search or seizure occurs, the constitutional protection is viable only to the extent that it restricts the authority responsible for making the search or seizure decision, prior to the time the decision crystallizes."). Nonetheless, the other safeguards do mitigate any resulting injury to the subject. For example, in order to detain a dangerous mentally ill person for more than ten days, the State must petition the district court, and prove beyond reasonable doubt that the patient poses a "likelihood of serious harm." See Mass. Gen. Laws Ann. ch. 123, ___ 7, 8 (requiring ongoing, periodic judicial review of commit- ment decision), 12(d); Commonwealth v. Nassar 406 N.E.2d 1286, ____________ ______ 1290-91 (Mass. 1980). 25 involuntary commitment orders could have far more serious conse- quences for the mentally ill, their families, and members of the public. Finally, such a detailed factfinding mission would greatly exceed any "screening" function normally undertaken by judicial officers in reviewing search warrant applications.  We discern no sufficient justification for superimpos- ing such a judicial factfinding mechanism upon the evaluation made by the licensed psychiatric physician in the involuntary commitment context, especially since it promises no corresponding systemic benefit to offset the systemic delays in executing pink papers in emergent circumstances. See Griffin, 483 U.S. at 876 ___ _______ ("A warrant requirement would interfere to an appreciable degree with the probation system, setting up a magistrate rather than the probation officer as the judge of how close a supervision the probationer requires.").  2. The Interests of the Mentally Ill 2. The Interests of the Mentally Ill _________________________________ Next, we consider the extent to which the category 2 search procedure infringes legitimate Fourth Amendment interests of the mentally ill. See T.L.O., 469 U.S. at 341; cf. also, ___ ______ __ ____ Rockwell, 26 F.3d at 256 ("Involuntary confinement for compulsory ________ psychiatric treatment is a `massive curtailment of liberty.'") (quoting Humphrey v. Cady, 405 U.S. 504, 509 (1972)) (citation ________ ____ omitted). We point out again, however, that McCabe presently challenges only the alleged infringement of Ms. Zinger's Fourth Amendment right to be free from unreasonable governmental entries to her residence, see supra note 2, and does not allege an ___ _____ 26 infringement of her liberty interest to be free from any unrea- sonable governmental restraint attending the subsequent seizure of her person.  (a) Civil Context (a) Civil Context _____________ Although the Fourth Amendment is implicated in a variety of civil proceedings, Soldal, 113 S. Ct. at 548, the ______ Supreme Court has made it clear that the civil nature of certain search procedures may call for a narrowed application of the warrant and probable cause requirements. Where a search proce- dure is not designed to gather information in a criminal investi- gation, its relative unintrusiveness may militate in favor of relaxing the warrant requirement. See O'Connor, 480 U.S. at 721 ___ ________ ("While police, and even [some] administrative enforcement personnel, conduct searches for the primary purpose of obtaining evidence for use in criminal or other enforcement proceedings,  employers most frequently need to enter the offices and desks of their employees for legitimate work-related reasons wholly unrelated to illegal conduct."); Wyman, 400 U.S. at 323 (home _____ visitation program "does not deal with crime or with the actual or suspected perpetrators of crime," and "[t]he caseworker is not a sleuth but rather, we trust, . . . a friend to one in need"); see also Project Release, 722 F.2d at 972-73 ("[T]he difference ___ ____ _______________ between civil and criminal confinement may nonetheless be re- flected in different standards and procedures applicable in the context of each of the two systems so long as due process is satisfied.") (citing Addington, 441 U.S. at 425). In the instant _________ 27 case, McCabe has not suggested that the challenged entry of the Zinger residence was effected for any criminal law purpose, or any regulatory purpose other than to enable her temporary hospi- talization and the psychiatric examination she adamantly refused. (b) Impartiality of Decisionmaker (b) Impartiality of Decisionmaker _____________________________ Finally, it is most significant in the present context that the official decision to initiate an involuntary "category 2" commitment rests with a licensed psychiatric physician, not with law enforcement officials. See Steagald, 451 U.S. at 212 ___ ________ (noting that the Fourth Amendment warrant requirement interposes "neutral" and detached judicial officer between police and "probable cause" determination). The Supreme Court consistently premises "special need" warrant exceptions on the presence of a search authorization by an impartial, or at least a relatively impartial person. See Cardona, 903 F.2d at 64-65 ("The [Griffin] ___ _______ _______ Court's focus was on the degree of security inherent in allowing a particular decisionmaker, i.e., a probation officer, to make a particular decision, i.e., whether a probationer's home should be searched, based on a particular (relatively modest) level of proof, i.e., `reasonable grounds.'"). Unlike the characteristic relationship between law enforcement personnel and criminal suspects, a committing physician's relationship with a patient, or even a nonpatient, is in no sense adversarial.  The role of the licensed physician under Massachusetts law is to provide a neutral, objective assessment of the "danger- 28 ousness" and "likelihood of serious risk" criteria upon which the involuntary commitment decision depends. A physician's ethical responsibilities likewise require that appropriate medical- psychiatric criteria be utilized in assessing the condition of the subject person. Cf., e.g., Griffin, 483 U.S. at 876 ("Al- __ ____ _______ though a probation officer is not an impartial magistrate, neither is he the police officer who normally conducts searches against the ordinary citizen. He is an employee of the State Department of Health and Social Services who, while assuredly charged with protecting the public interest, is also supposed to have in mind the welfare of the probationer."). Nor is there any allegation or evidence that the Lynn police possessed or exer- cised any influence, direct or indirect, over the medical-psychi- atric decision to issue the pink paper. Cf. T.L.O., 469 U.S. at ___ ______ 337 n.5 ("Nor do we express any opinion on the standards (if any) governing searches of such areas by school officials or by other public authorities acting at the request of school officials."). The district court nonetheless struck down the City policy because "the agents of the doctors in this case are police officers with guns and batons, not hospital orderlies and nurs- es," so that "[t]here is no therapeutic relationship which a warrant mechanism would disrupt." McCabe, 875 F. Supp. at ______ 61.13 Whether an administrative search procedure leaves too  ____________________ 13Although there is no evidence that Dr. Barden had been Ms. Zinger's regular physician, the challenged City policy is to be evaluated in light of its systemic traits and purposes. Cf. ___ Cardona, 903 F.2d at 67; supra pp. 22-23. No doubt many, if not _______ _____ most, category 2 searches are executed pursuant to pink papers 29 much discretion to law enforcement officers in the field is a recurring Fourth Amendment concern. See, e.g., Camara, 387 U.S. ___ ____ ______ at 532-33 ("The practical effect of this system is to leave the occupant subject to the discretion of the official in the field. This is precisely the discretion to invade private property which we have consistently circumscribed by a requirement that a disinterested party warrant the need to search."). Under Mass.  Gen. Laws Ann. ch. 123, 12(a), however, the decision to conduct a category 2 "search" is never left to the executing officers. Moreover, the mere fact that law enforcement officials serve as the agents who implement the authorizing physician's decision to approve a category 2 search does not necessarily mean that the procedure is not within the "special need" category:  [W]e fail to see any constitutional signifi- cance in the fact that police officers, rath- er than "administrative" agents, are permit- ted to conduct the 415-a5 inspection. The significance respondent alleges lies in the role of police officers as enforcers of the penal laws and in the officers' power to arrest for offenses other than violations of the administrative scheme. It is, however, important to note that state police officers, like those in New York, have numerous duties in addition to those associated with tradi- tional police work. . . . As a practical matter, many States do not have the resources  ____________________ issued by the subject-patient's current or former psychiatric physician. Unlike law enforcement officers, who rarely interact with a search target on more than one occasion, as a rule physi- cians possess reliable personal knowledge of their patients, based on an ongoing doctor-patient relationship. Cf. Griffin, ___ _______ 483 U.S. at 879 ("As was true, then, in [O'Connor] . . . and ________ [T.L.O.], we deal with a situation in which there is an ongoing ______ supervisory relationship and one that is not, or at least not entirely, adversarial between the object of the search and the decisionmaker.").  30 to assign the enforcement of a particular administrative scheme to a specialized agen- cy. So long as a regulatory scheme is prop- erly administrative, it is not rendered ille- gal by the fact that the inspecting officer has the power to arrest individuals for vio- lations other than those created by the scheme itself. In sum, we decline to impose  upon the States the burden of requiring the enforcement of their regulatory statutes to be carried out by specialized agents. Burger, 482 U.S. at 717-18; Cardona, 903 F.2d at 65 ("The [Grif- ______ _______ _____ fin] Court did not lend any special salience to the identity of ___ the person(s) executing the search"; "[w]hether the decision, once reached [by the probation officer], is realized through police officers, parole officers, or a tag team representing both camps, is peripheral to the Court's holding.").  We conclude that these considerations, on balance, favor a limited "special need" exception to the warrant require- ment in the particular setting presented in this case. Accord- ingly, we hold that the Fourth Amendment is not infringed by the challenged City policy, which authorizes warrantless entries of residences by the police for the sole purpose of executing a properly issued category 2 pink paper within a reasonable time after its issuance.  III III CONCLUSION CONCLUSION __________ We retrace the bounds of our ruling. We do not suggest that the factors we have discussed, see Section II.D, alone or in ___ combination invariably provide adequate support for a "special need" exception to the warrant requirement. The balancing test 31 for determining whether an administrative procedure comes within the "special need" exception is designedly fact-specific, and must be calibrated anew in assessing the reasonableness of each administrative search procedure to which it is applied. Nor, of course, do we suggest that all comparable state involuntary commitment statutes, or any other provision of Mass. Gen. Laws Ann. ch. 123, or other categories of searches authorized under chapter 123, section 12(a), necessarily satisfy the Fourth Amendment. See, e.g., Wyman, 400 U.S. at 326 ("Our holding today ___ ____ _____ does not mean . . . that a termination of benefits upon refusal of a home visit is to be upheld against constitutional challenge under all conceivable circumstances. The early morning mass raid upon homes of welfare recipients is not unknown."). We hold only that law enforcement officers in possession of a pink paper, duly issued pursuant to category 2, Mass. Gen. Laws Ann. ch. 123,  12(a), may effect a warrantless entry of the subject's residence within a reasonable time after the pink paper issues.  32 Since the challenged City policy comports with the "special need" exception to the Fourth Amendment warrant require- ment, the City is entitled to summary judgment. We intimate no viewpoint concerning any other aspect of these proceedings, including the McCabe claims against the individual police offi- cers, the constable, and the ambulance crew, which claims were dismissed, without prejudice. See supra note 3. ___ _____ The district court judgment is reversed and the case is The district court judgment is reversed and the case is _______________________________________________________ remanded to the district court for further proceedings consistent remanded to the district court for further proceedings consistent _________________________________________________________________ with this opinion; costs to appellant. with this opinion; costs to appellant. _____________________________________ 33 APPENDIX APPENDIX Chapter 123, Section 12: (a) Any physician who is licensed pursuant to section two of chapter one hundred and twelve or quali- fied psychiatric nurse mental health clinical special- ist authorized to practice as such under regulations promulgated pursuant to the provisions of section eighty B of said chapter one hundred and twelve or a qualified psychologist licensed pursuant to sections one hundred and eighteen to one hundred and twen- ty-nine, inclusive of said chapter one hundred and twelve, who after examining a person has reason to believe that failure to hospitalize such person would create a likelihood of serious harm by reason of mental illness may restrain or authorize the restraint of such person and apply for the hospitalization of such person for a ten day period at a public facility or at a private facility authorized for such purposes by the department.  If an examination is not possible because of the emer- gency nature of the case and because of the refusal of the person to consent to such examination, the physi- cian, qualified psychologist or qualified psychiatric nurse mental health clinical specialist on the basis of the facts and circumstances may determine that hospi- talization is necessary and may apply therefore.  In an emergency situation, if a physician, qualified psychologist or qualified psychiatric nurse mental health clinical specialist is not available, a police officer, who believes that failure to hospitalize a person would create a likelihood of serious harm by reason of mental illness may restrain such person and apply for the hospitalization of such person for a ten day period at a public facility or a private facility authorized for such purpose by the department. An application for hospitalization shall state the reasons for the restraint of such person and any other relevant information which may assist the admitting physician or physicians. Whenever practicable, prior to transport- ing such person, the applicant shall telephone or otherwise communicate with a facility to describe the circumstances and known clinical history and to deter- mine whether the facility is the proper facility to receive such person and also to give notice of any restraint to be used and to determine whether such restraint is necessary. .... 34 (e) Any person may make application to a district court justice or a justice of the juvenile court de- partment for a ten day commitment to a facility of a mentally ill person whom the failure to confine would cause a likelihood of serious harm. After hearing such evidence as he may consider sufficient, a district court justice or a justice of the juvenile court de- partment may issue a warrant for the apprehension and appearance before him of the alleged mentally ill person, if in his judgment the condition or conduct of such person makes such action necessary or proper. Following apprehension, the court shall have the person examined by a physician designated to have the authori- ty to admit to a facility or examined by a qualified psychologist in accordance with the regulations of the department. If said physician or qualified psycholo- gist reports that the failure to hospitalize the person would create a likelihood of serious harm by reason of mental illness, the court may order the person commit- ted to a facility for a period not to exceed ten days, but the superintendent may discharge him at any time within the ten day period. 35