Breen v. Salem, NH                    CV-95-439-M    09/25/96

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Martha Breen and Kevin J. Breen,
     Plaintiffs,

     v.                                          Civil No. 95-439-M

Fred A. Rheault; Mark F. Cavanaugh;
Richard Dunn; Alan Gould; James E.
Ross; Barry M. Brenner; and the
Town of Salem, New Hampshire,
     Defendants.


O R D E R


Though plaintiffs' complaint seems to assert multiple causes of action, this is basically a civil rights case, brought under 42 U.S.C. § 1983.  Plaintiffs seek redress for an alleged violation of Kevin Breen's right under the Fourth Amendment not to be arrested except upon probable cause, and assert various state law causes of action as well.  All the named defendants have moved for summary judgment on essentially two grounds: 1) Plaintiff Kevin Breen's arrest was based on probable cause, and 2) even if it wasn't, the police officers obtained an arrest warrant and are entitled to qualified immunity (and the other defendants are otherwise not liable as a matter of law).  As explained below, all defendants are entitled to entry of summary

judgment in their favor on the federal causes of action asserted by plaintiffs.

**Background**

The opposing pleadings and supporting affidavits and documents show that on September 13, 1993, Plaintiff Kevin Breen, a Salem Fire Department lieutenant, attended a Boston Red Sox game at Fenway Park with three friends: Glenn Milner, an attorney who represented the Salem firefighters' union, Dennis Covey, a Salem firefighter, and Jay Crooks. The group drove to Boston in Milner's car, which was equipped with a cellular telephone. After the game, the group set out for the "Golden Banana," a nightclub of sorts in Saugus, Massachusetts. Apparently the group had been drinking (Breen, however, denies that <u>he</u> was drinking, claiming to have been the "designated driver").

On the way to the Golden Banana, at about 11:30 p.m., two calls were placed from Milner's car phone to the Salem Fire Department. The first call was apparently made for the purpose of harassing Salem Fire Captain Kevin Kimball, who was on duty at the station that night, and the second was made by Milner to disassociate himself from the first call. Captain Kimball failed

2

to appreciate either the sentiments expressed or the humor apparently shared by those in the car. He took the matter seriously, directing the dispatcher, Cheryl Ritchie, to record both calls in the department phone log, with details. He also reported the matter to the Fire Chief and to the Salem Police Department.

The Salem Police responded to Kimball's complaint by initiating an investigation. Detectives Cavanaugh and Rheault were assigned to look into the incident. Cavanaugh and Rheault interviewed Ritchie, Captain Kimball, and two Methuen (Massachusetts) police officers who had had contact with the revellers following their involvement in an unrelated disturbance that same night at a gas station. Based on their initial investigation, on September 21, 1993, Detective Cavanaugh applied for and obtained a warrant to arrest Plaintiff Breen on a misdemeanor charge of telephone harassment in violation of N.H. Rev. Stat. Ann. ("RSA") 644:4.[1] Covey was also charged, and

---

[1] RSA 644:4 (1971), the misdemeanor statute in effect at the time provided:

> A person is guilty of a misdemeanor, and subject to prosecution in the jurisdiction where the telephone call originated or was received, if, with a purpose to annoy or alarm another, he:
>
> I. Makes a telephone call, whether or not a

3

charges were drafted but, as explained later, never lodged against Milner. Breen and Covey turned themselves in for arrest on the warrant on September 23, 1993.

Focusing on what information the police officers had at the time the arrest warrant was obtained, the following facts appear undisputed (plaintiffs have offered no contradictory evidence). On September 14, 1993, the Fire Department's dispatcher, Cheryl Ritchie, told the police investigators that at about 11:20 p.m. the previous evening a phone call came in to the Fire Department on the non-emergency number, 888-9775. The call struck Ritchie as odd because the published number is 888-9774. If the 9774 line is busy then an incoming call is automatically switched to the 9775 line. The 9774 line was not busy, so Ritchie assumed the caller was familiar with the Salem Fire Department. When Ritchie answered the phone she was greeted with, "[Y]ou fucking asshole, get me Kevin." See Continuation of Investigation Report, p.2, September 15, 1993, appended to Defendants' Motion

---

conversation ensues, without purpose of lawful communication; or
    II. Makes repeated communications at extremely inconvenient hours or in offensively coarse language; or
    III. Insults, taunts or challenges another in a manner likely to provoke a violent or disorderly response.

4

for Summary Judgment.  In the background she heard several people laughing and bantering about "Kevin" or "Kimball."  Ritchie assumed the caller or callers were drunk.  Ritchie dutifully transferred the call to Captain Kimball, who by that time was in bed, having retired at the station due to his overnight on-call status.  A few minutes later, a second call came in on the same line, 9775.  Ritchie answered it and a person she thought she recognized as Attorney Milner stated that he wanted nothing to do with the prank regarding [Captain] Kevin Kimball.  The caller then identified himself as Milner, and Ritchie asked Milner if he made the earlier call to the station.  Milner denied having made the first call.  Ritchie then asked Milner who was in the car with him.  Milner identified Plaintiff Breen and Dennis Covey, both Salem firefighters.  During the first and the second call Ritchie heard laughter and profanity in the background, with references to Captain Kimball.  Ritchie asked to speak to Lt. Breen.  Breen took the phone and Ritchie asked him about the prior call to the station.  Breen denied any knowledge of any calls and ended the conversation by saying he had to "take two guys home."  Id., p.3.  Ritchie also told the police that Captain Kimball was monitoring this second call, and at its conclusion directed Ritchie to log both calls and their nature.

5

Kimball also asked Ritchie if she knew the callers and she told Kimball that they were Milner and Lt. Breen.

On September 15, 1993, the police interviewed the complainant, Captain Kimball. He told Detective Rheault that on September 13 he was awakened by Dispatcher Ritchie's referral of a phone call, said by the caller to be an emergency. Kimball picked up the phone and heard what sounded like a conversation over a car phone (because the sound was fading in and out). When the sound became clear, Kimball recognized the voice of Salem Fireman Dennis Covey, who made the following statements: "What a fucking asshole you are, you dick sucker fucking asshole, you need to be taught a fucking lesson and I'm going to stick it up your fucking ass, fuck him and fuck her." Police Investigation Report, Kimball Interview, p. 3, appended to Defendants' Motion for Summary Judgment. Kimball also heard general laughter and yelling on the other end. Kimball told the police that the line became unclear again and when it cleared the person speaking was no longer Covey. The new speaker talked of calling Kimball's wife. Kimball told the police that at that point he became concerned, felt threatened, and feared for his family's safety. There continued to be yelling over the phone, then Kimball heard "Kevin, Kevin" and "[Y]ou['re] a fucking asshole." Id. Captain

6

Kimball told the police that those comments were definitely made by Plaintiff Breen, whose voice Kimball knew. Kimball told the police that he was "100% sure" that the person speaking was Breen. Id., p.4. According to Captain Kimball, laughter, raucous yelling, and profanity continued among the vehicle occupants, then the phone went dead. Kimball said he was dumbfounded, and while pondering his options, another call came in on the 9775 line. Kimball picked up the line to monitor the call and heard the second call from Milner, as reported by Ritchie in all material respects.[2] That is essentially what the police knew about the September 13 incident when they sought and obtained the warrant for Breen's arrest.

As it is somewhat relevant to plaintiffs' claims, as he perceives them, a brief review of additional information obtained by the police after Breen's arrest is warranted as well. On September 30, a week after Breen's arrest, the police interviewed Jay Crooks, a passenger in the car, who generally told them that

_____

[2] The police later learned (on September 30) that at least one, and more likely two, additional calls was made to the station that evening, at 2:30 a.m. on September 14, by Covey, who said he was with Breen. The dispatcher then on duty, Brian Chevalier, heard Breen in the background telling Covey to get off the phone. Investigative Report, Chevalier Interview, appended to Defendants' Motion for Summary Judgment. According to Milner' subsequent statement, the party had moved to a Denny's restaurant by that time.

7

the men were horsing around with the phone, calling wives and girlfriends, etc., when Covey suggested calling Captain Kimball. Crooks denied any knowledge of Breen or Milner interceding and telling Covey not to call Kimball (as was later contended by Milner). Crooks said Covey actually dialed the number and then handed the phone to him, telling him to ask for Kevin Kimball and stating that he (Covey) did not want Kimball to recognize his voice. Crooks demurred, so Covey spoke into the phone. Though Crooks claimed not to remember what Covey said, he did acknowledge "There was a lot of swearing and yelling going on." Id. Crooks told the police that the next day he saw Attorney Milner, who told him "the firemen [Breen and Covey] are in trouble and are going to blame you for the call." Id. Crooks denied knowing a fire station had been called and said Covey initiated the whole thing.

Also on September 30, the police interviewed Attorney Milner, but only after Milner's own lawyer arranged a cooperative deal — Milner would talk so long as he was not charged (the police had already drafted charges against him based on his alleged participation). Milner also said the call to Kimball was Covey's idea, that he (Milner) tried to dissuade Covey, and that there was a great deal of joking, laughing, and swearing going

8

on. Continuation of Investigation/Arrest Report, dated September 30, 1993, Milner Interview, p.1, appended to Defendants' Motion for Summary Judgment. The police thought Milner was trying to avoid telling them what Breen had been saying or doing. Id. In an affidavit filed in this case, however, Milner says he made it clear to the police that he and Breen tried to dissuade Covey, and points out that Fire Chief Nadeau wrote to Defendant Gould on September 23, 1993, to report the contents of a call Milner placed to the Chief within two days of the incident in which Milner put the blame on Covey and said Breen had advised Covey "not to do it." See Letter, Nadeau to Gould, dated September 23, 1993, appended to Defendants' Motion for Summary Judgment. Milner acknowledged making the second call in which he sought to disassociate himself from the first call. Milner also told the police that at about 2:00 to 2:30 a.m. the group was at a Denny's restaurant, but he had no explanation for two additional calls his phone records showed were made around that time to the fire station from his car phone.

**Plaintiffs' Claims**

9

First, plaintiffs, Breen and his wife,[3] cast most of their causes of action in terms of denials of both "substantive due process" and "due process," and violations of his rights under the Fourth, Fifth and Fourteenth Amendments. The Supreme Court has made it abundantly clear that § 1983 claims alleging unconstitutional arrest are properly brought only under the Fourth Amendment. See Albright v. Oliver, 114 S.Ct. 807, 813 (1994); Graham v. O'Connor, 490 U.S. 386 (1989). Accordingly, the court will assume that Breen's federal causes of action brought pursuant to 42 U.S.C. § 1983 are based on his claimed deprivation of his right under the Fourth Amendment not to be arrested except upon a warrant supported by probable cause.

The defendants raise a number of issues in their dispositive motion, but particularly stress that no constitutional violation has been shown to have occurred, and even if such a violation did occur, qualified immunity and other defenses preclude liability. Of course, public officials, like police officers, who perform discretionary functions are entitled to qualified immunity from suit for violations of federal law "insofar as their conduct does not violate clearly established statutory or constitutional

---

[3] Mrs. Breen's claims involve alleged loss of consortium and damages related to state causes of action.

rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The qualified immunity analysis in this circuit is two-pronged: (1) "the court must establish whether the constitutional right asserted by the plaintiff was 'clearly established' at the time of the alleged violation," and (2) "the court must ask whether 'a reasonable official situated in the same circumstances should have understood that the challenged conduct violated that established right.'" St. Hilaire v. City of Laconia, 71 F.3d 20, 24 (1st Cir. 1995) (quoting Burns v. Loranger, 907 F.2d 233, 236 (1st Cir. 1990)), cert. denied, 116 S. Ct. 2548 (1996). "The ultimate question of whether a defendant is entitled, on a given set of facts, to the protection of qualified immunity is a question of law for the court to decide." Wood v. Clemons, 89 F.3d 922, 927 (1st Cir. 1996).

A "necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." Siegert v. Gilley, 500 U.S. 226, 232 (1991). If the plaintiff has failed to show a constitutional violation, the court may bypass the qualified immunity analysis

11

and address the merits of the claim.  Brown v. Hot, Sexy and Safer Productions, Inc., 68 F.3d 525, 531 (1st Cir. 1995).  The burden is on the plaintiff to provide sufficient support for his federal claim to show infringement of a federal right, and if he fails to do so, the defendant is necessarily entitled to summary judgment.  See Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 228 (1st Cir. 1992).

Here, Breen faces two major difficulties.  First, although the Fourth Amendment right not to be arrested except upon probable cause was clearly established at the time of his arrest, the information developed by Detectives Rheault and Cavanaugh before applying for the warrant was, as a matter of law, more than adequate to establish probable cause to arrest him for harassing Captain Kimball in violation of New Hampshire's criminal law.  So, Breen's Fourth Amendment rights, though clearly established, were not violated.  Second, even if the police officers did not have probable cause (that is, even if a Fourth Amendment violation is assumed), a reasonable police officer possessing the same information they had, could have reasonably believed that probable cause existed.  So, the officers' conduct in obtaining the warrant and effecting Breen's

12

arrest was objectively reasonable, entitling them to qualified immunity from suit and from liability.

Rheault and Cavanaugh had reasonably trustworthy information from Captain Kimball, the direct victim, and from Dispatcher Ritchie that:  On September 13 a phone call was made to the Salem Fire Department; the caller or callers wanted to speak to Captain Kimball; when Kimball was notified and put on the line, at least two people abused him directly, using insulting, vulgar language, and at least implicitly suggested that his wife would likely be abused in a similar fashion; the language, content, and general moronic tenor of the call attested to its obvious purpose to annoy or alarm Kimball; the nature and context of the call easily supported an inference that it was a group effort; the call was made from Milner's car phone; Lieutenant Breen was in Milner's car when the call was placed; Kimball positively identified Breen as one of the callers who clearly spoke over the phone and who directed vulgar and insulting language toward him (the other clearly identified speaker being Covey, the other Salem firefighter and the alleged mastermind); and of course Ritchie confirmed that the calls were in fact received, and that Breen was in the car when the obviously harassing call was made.

13

Any reasonable officer armed with that information, could readily and reasonably conclude that there was probable cause[4] to believe that the call was harassing within the meaning of RSA 644:4; that Breen associated himself with and participated in the harassing call; that Breen spoke the specific vulgarities attributed to him by Captain Kimball; that Breen directed his own vulgar comments to Captain Kimball for the purpose of annoying or alarming Kimball; and that Breen joined in Covey's vulgar comments to Captain Kimball, all in violation of RSA 644:4. That Breen denied making the first call when Ritchie asked him about it hardly served to undermine probable cause.

Subsequent investigation, after the arrest warrant was issued but before Breen surrendered himself at the police station, did not develop any information that effectively undermined the officers' reasonable conclusion as to the probability that Breen did exactly what Kimball said he did.

---

[4] "Probable cause exists if `the facts and circumstances within [a police officer's] knowledge and of which [the officer] had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution' to believe that a crime has been committed or is being committed." Alexis v. McDonald's Restaurants of Mass. Inc., 67 F.3d 341, 351 (1st Cir. 1995) (quoting Carroll v. United States, 267 U.S. 132, 162 (1925)). A probable cause determination is based on a reasonable probability that the suspect committed a crime and does not require sufficient evidence to convict. Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir. 1992).

And, that various other suspects later began giving self-exculpatory statements, or placed the entire blame on Covey (the only other Salem firefighter in the car) also did not undermine probable cause, given Captain Kimball's direct statement implicating Breen. The police are not required, nor are they expected, to anticipate or resolve defenses likely to be asserted by criminal suspects, nor are they required to determine a suspect's guilt beyond a reasonable doubt before seeking an arrest warrant. Here, the information the police had on September 21 and 23, 1993, made it more than "probable" that Breen violated RSA 644:4. Thus, the arrest warrant was supported by probable cause and there was no constitutional violation.

However, even if probable cause were found to be lacking and a Fourth Amendment violation is assumed, these officers would still be entitled to qualified immunity. While plaintiff seems to make much of perceived animosity or bias on the part of the police officers — supposedly arising from past investigations or competing union interests (Breen served as an officer of the firefighter's union), or friendship between the police officers and Captain Kimball,

> "[u]nder the Harlow standard . . . an allegation of
> malice is not sufficient to defeat immunity if the
> defendant acted in an objectively reasonable manner."

15

> Malley v. Briggs, 475 U.S. 335, 341 (1986). Seeking an arrest warrant is `objectively reasonable' so long as the presence of probable cause is at least arguable. [citation omitted] Police officers "will not be immune if, on an objectively reasonable basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue immunity should be recognized." Malley, 475 U.S. at 341. Thus, in cases where law enforcement officials reasonably but mistakenly conclude that probable cause is present, those "officials — like other officials who act in ways they reasonably believe to be lawful — should not be held personally liable. Anderson v. Creighton, 483 U.S. 635, 641 (1987).

Prokey v. Watkins, 942 F.2d 67, 72 (1st Cir. 1991).

Plaintiff does not dispute that Captain Kimball told the police that Breen made the referenced statements to him during the first call, and does not dispute that Ritchie told the police what they say she told them. What the police knew prior to obtaining the arrest warrant and prior to effecting the arrest is not in genuine dispute. Therefore, whether a reasonable police officer could have believed there was probable cause to arrest Breen based on the information known to the police in this case at the time they obtained the warrant and effected the arrest is a question of law for the court to resolve. Prokey v. Watkins, 942 F.2d at 73. There can be no doubt that probable cause in this case was "at least arguable." Beyond that very low standard, however, it is clear that the officers did act with

16

objective reasonableness in seeking the warrant to arrest Breen. So, even if they were mistaken as to probable cause, in this case the officers would still be entitled to qualified immunity.

There are one or two other sub-themes running through Breen's complaint and summary judgment response that ought to be addressed. One is that the police "jumped the gun," that is, they were obligated to investigate further before they applied for Breen's arrest warrant. The implication seems to be that had they first interrogated Milner or Covey or Crooks or Breen himself (i.e. the people in the car), they would have had no cause to believe Breen was involved, much less a direct participant in the harassing call, because they would have known only Covey was criminally liable. That argument fails.

While police are obligated to conduct fair investigations, they have no constitutional duty to investigate any particular information and no duty to investigate after determining that probable cause exists to arrest a suspect. See Baker v. McCollan, 443 U.S. 137, 146 (1979) (Police have no duty to investigate every claim of innocence); Franco-DeJerez v. Burgor, 876 F.2d 1038, 1042 (1st Cir. 1989) (no duty to investigate after a determination of probable cause to arrest); see also Romero v.

17

_Fay_, 45 F.3d 1472, 1476-77 (10th Cir. 1995) (collecting cases discussing police duty to investigate prior to arrest).

This is not to say that the information the police had at the time of Breen's arrest proved Breen's guilt by any means. Breen could well have not said what Kimball attributed to him; he could well have been the sobering influence seeking to restrain his inebriated companions. Indeed, Breen was later acquitted in a bench trial. But Breen's actual guilt or innocence is not the issue — the issue is whether probable cause existed to believe Breen committed the offense of harassment at the time of his arrest, or whether an objectively reasonable police officer could arguably have thought probable cause existed based on the information the police had at that time.

Another theme permeating plaintiffs' complaint and summary judgment response is the notion that at some point the police should have realized that Captain Kimball was wrong; that Breen did not participate in the harassing call; that Covey alone was responsible; that in fact Breen interceded (with Milner) to try and dissuade Covey; and, therefore, the police should have dropped the prosecution.[5] Plaintiff makes no claim or assertion

_____

[5] Plaintiff also seems to base part of his complaint on an assertion that Defendants Gould, Dunn, Rheault and Cavanaugh (all Salem police officers) unlawfully sought to present evidence

18

that the police failed to turn over any exculpatory or impeachment evidence to the state's prosecutor. See e.g. MacMilliam v. Johnson, 88 F.3d 1554, 1566-67 (11th Cir. 1996) (collecting cases); Walker v. City of New York, 974 F.2d 293, 299 (2d Cir. 1992) (collecting cases), cert. denied, 507 U.S. 9611 (1993). The state's prosecutor, Diane M. Gorrow, Esq., filed an affidavit in support of summary judgment in which she attests that she was the prosecutor for the Salem Police Department, not any of the named defendants, and the exhibits filed by plaintiff confirm that Attorney Gorrow presented the criminal case.

So, to the extent plaintiff seeks to impose liability on defendants for his continued prosecution, it would seem that Attorney Gorrow and not the police defendants made the prosecutorial decisions. As a state prosecutor, Attorney Gorrow would enjoy absolute immunity for any acts related to the initiation and conduct of Breen's criminal prosecution. Imbler

supporting a charge of felony witness tampering against Breen to a grand jury. While it appears uncontroverted that such a charge was referred by the police to the local county attorney, the charge was not presented to the grand jury. The county prosecutor believed an indictment would likely be returned but a conviction, requiring proof beyond a reasonable doubt, would not likely result. So, he exercised his prosecutorial discretion not to present the case. Whether to charge a suspect, whether to present a case to a grand jury, and whether to decline to prosecute a case are all prosecutorial functions for which the actor(s) enjoy absolute immunity. Imbler v. Pachtman, infra.

19

v. Pachtman, 424 U.S. 409, 431 (1976).  Moreover, courts employ a functional approach when evaluating the availability of absolute prosecutorial immunity.  See Butz v. Economic, 438 U.S. 478, 515 (1978).  Therefore, the police officer defendants also would be entitled to prosecutorial immunity to the extent that they performed prosecutorial functions as "advocate[s] for the state." Guzmen-Rivera v. Rivera-Cruz, 55 F.3d 26, 29 (1st Cir. 1995) (quoting Burns v. Reed, 500 U.S. 478, 491 (1991)); see also Malachowski v. City of Keene, 787 F.2d 704, 712 (1st Cir.), cert. denied, 479 U.S. 828 (1986).  The decision not to dismiss a criminal case (or to continue to pursue it) "lies at the heart of the prosecutorial function."  Guzman v. Rivera, 55 F.3d at 31.

Accordingly, although it is by no means clear that plaintiff is asserting a federal claim related to his continued prosecution, to the extent he is, such a claim would be and is precluded by prosecutorial immunity.[6]

---

[6]  Parenthetically, while plaintiff does assert a state law claim based on "malicious prosecution," New Hampshire law also provides absolute immunity from liability for any acts that are "functionally related to the initiation of criminal process or to the prosecution of criminal charges."  Belcher v. Paine, 136 N.H. 137, 146 (1992).

**Supervisory Liability and Municipal Liability**

A plaintiff suing a supervisor under § 1983 must show that (1) a subordinate violated his constitutional rights; (2) the supervisor's acts or omissions caused the subordinate's unconstitutional conduct; and (3) the supervisor was deliberately indifferent to the constitutional rights of others in acting or failing to act. Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 92 (1st Cir. 1994); Manarite, 957 F.2d at 955-56. A supervisor displays deliberate indifference only if "it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights." Febus-Rodriguez, 14 F.3d at 92. To avoid summary judgment on a claim of supervisory liability, a plaintiff must "proffer sufficient evidence to create a trial issue as to whether the actions" of the supervisory defendants violated the plaintiffs' constitutional rights. Id. at 94. As is always true in opposing summary judgment, the plaintiff cannot rely on "[o]ptimistic conjecture, unbridled speculation, or hopeful surmise" to meet his burden of establishing a triable issue as to every element of his claim. See Vega v. Kodak Caribeean, Ltd., 3 F.3d 476, 479 (1st Cir. 1993).

21

Plaintiff has utterly failed to present any evidence, or even to allege any facts, sufficient to create a trial issue as to whether the actions of any of the supervisory defendants violated plaintiffs' federal rights. Conjecture and surmise is not enough; saying it does not make it so. In reality, plaintiff merely asserts that police supervisors also should have recognized that probable cause was lacking and intervened to prevent Breen's arrest, without providing sufficient factual support to establish the elements required for supervisory liability. In addition, probable cause was not lacking, and the supervisory defendants, like the arresting officers, could have believed, with objective reasonableness, that probable cause existed and so are entitled to qualified immunity.

**Municipal Liability**

A claim of municipal liability under § 1983 must be based on a municipal policy, custom, or practice that caused, or was a moving force behind, a deprivation of the plaintiffs' constitutional rights. Monell v. Department of Social Servs., 436 U.S. 658, 694 (1978). Although a single incident of significant magnitude can provide some proof of a municipal policy or custom to act in a manner consistent with the incident,

22

it is insufficient standing alone to prove an underlying policy or custom.  Bordanaro v. McLeod, 871 F.2d 1151, 1156-67 (1st Cir.), cert. denied, 493 U.S. 820 (1989).  In addition, a single action by a municipal official may qualify as a policy, but only if the decision was "made by the official charged with the final responsibility for making it under local law."  Harrington, 977 F.2d at 45; St. Louis v. Praprotnik, 485 U.S. 112, 124, 143 (1988); Pembaur, 475 U.S. at 483.  If the plaintiff can establish the existence of a municipal policy or custom, he must then show that the policy caused or was the moving force behind a deprivation of his constitutional rights.  See McCabe v. Life-Line Ambulance Serv., 77 F.3d 540, 544 (1st Cir.), Petition for cert. filed, 64 USLW 3808 (May 29, 1996).

Although plaintiff employs the right terms — "policy," "custom," etc. — he has failed to present any evidence or even to allege any facts from which a jury could find that some municipal policy or custom served as the moving force behind a deprivation of his federal rights.  First, his federal rights were not violated.  Second, he does not assert, for example, that it was the policy or custom of Salem or the Salem Police Department to effect arrests without probable cause, or to target Salem firefighters for unlawful arrest, or to fail to train police

23

officers in the Fourth Amendment's requirement of probable cause to arrest. Plaintiffs' only point seems to be that better trained investigators would have gone further with the investigation before seeking an arrest warrant. That is not sufficient to show the existence of a policy or custom likely to cause violations of citizens' constitutional rights.

Plaintiff also includes the Town of Salem, the Town Manager and various supervising police officials as defendants in their respective official capacities. Because Breen was arrested pursuant to a warrant that was supported by probable cause, and no violation of any of his federal rights occurred, these defendants are of course entitled to summary judgment on his federal causes of action. They are also entitled to summary judgment because, even in the absence of probable cause, no basis for supervisory or municipal liability exists, and because to the extent they are sued in their official capacities, those claims are simply claims against the municipality. See, e.g., Kentucky v. Graham, 473 U.S. 159, 165 (1985); Monell v. New York Dep't of Social Servs., 436 U.S. 658, 590 n.55 (1978).

## Conclusion

24

Summary judgment is entered in favor of all defendants on all federal claims asserted by plaintiffs.  The court declines to exercise its supplemental jurisdiction over the causes of action asserted by plaintiffs under state law, and those claims are dismissed without prejudice.  See, 28 U.S.C. § 1367(c)(3).  The clerk shall close this case.

SO ORDERED.

_____
Steven J. McAuliffe
United States District Judge

September 25, 1996

cc:  Donald E. Mitchell, Esq.
     William G. Scott, Esq.
     Diane M. Gorrow, Esq.